959 So.2d 150 (2007)
THE FLORIDA BAR, Complainant,
v.
Francisco Ramon RODRIGUEZ, Respondent.
No. SC03-909.
Supreme Court of Florida.
May 3, 2007.
Rehearing Denied June 5, 2007.
*152 John F. Harkness, Jr., Executive Director, Kenneth L. Marvin, Director of Lawyer Regulation, James A.G. Davey, Jr. and Donald M. Spangler, Bar Counsels, The Florida Bar, Tallahassee, FL, for Complainant.
Michael Nachwalter and Lauren C. Ravkind of Kenny Nachwalter, P.A., Miami, FL, for Respondent.
PER CURIAM.
We have for review a referee's report recommending that Francisco Ramon Rodriguez be found guilty of professional misconduct and that he receive a public reprimand and serve a four-year period of probation. The referee also recommends denying The Florida Bar's request that Rodriguez be ordered to forfeit prohibited fees to the Clients' Security Fund. We have jurisdiction. See art. V, § 15, Fla. Const.
For the reasons explained herein, we disapprove the referee's recommendation that Rodriguez receive a public reprimand and serve probation. Instead, we impose a two-year suspension. Further, we order Rodriguez to disgorge his portion of the prohibited fee to the Clients' Security *153 Fund, including the taxes and interest on that fee.[1]

BACKGROUND
Rodriguez was a shareholder in the law firm of Friedman, Rodriguez, Ferraro, and St. Louis. The firm was hired to represent twenty clients who sought to sue DuPont Corporation for damages allegedly resulting from use of the DuPont product Benlate, a fungicide that was suspected of causing severe crop damage and was recalled from the market in March 1991. The partners in the firm were Paul D. Friedman, Diane D. Ferraro, Roland R. St. Louis, and Francisco R. Rodriguez. The Florida Bar brought separate disciplinary actions against the four named partners of the firm alleging that they committed misconduct by engaging in a secret "engagement agreement" with the DuPont Corporation, solely for their own financial benefit, while they were representing the clients in the Benlate cases against DuPont. Based on the partners' separate acts of misconduct, they received different sanctions.
Ferraro received a public reprimand and made restitution of $425,000 to the clients. Fla. Bar v. Ferraro, 839 So.2d 700 (Fla. 2003) (table citation). The sanction was based on the referee's finding that Ferraro had "absolutely nothing to do with the settlement negotiations with DuPont" and did not even know about the engagement agreement until well after her former partners received the prohibited funds. Also, Ferraro agreed to testify against her former partners. Due to these facts, the referee ultimately recommended a public reprimand, after finding that a suspension or disbarment was not appropriate.
Friedman did not know about the engagement agreement until after it had been executed. Thus, he had a comparatively smaller role in the firm's misconduct than St. Louis and Rodriguez. Also, Friedman cooperated with the Bar and he paid restitution before his disciplinary case was reviewed by this Court. However, Friedman partook in the financial benefits of the unethical engagement agreement, exposed the Benlate clients to potential harm by engaging in the conflict of interest, and acquiesced in the firm lying to the clients. He did not take any measures to inform clients or repudiate the engagement agreement. In fact, as Secretary-Treasurer of the firm, Friedman received the prohibited funds from DuPont. Therefore, Friedman's misconduct merited a ninety-day suspension and payment of restitution in the amount of $910,000. Fla. Bar v. Friedman, 940 So.2d 428 (Fla.2006) (table citation).
St. Louis and Rodriguez were the firm's principal actors in developing and executing the secret engagement agreement. As will be discussed herein, Rodriguez's misconduct is less egregious than St. Louis's misconduct. St. Louis negotiated the engagement agreement for the firm, placed his financial interests above those of his clients with regard to DuPont, and lied to Judge Wilson and the Bar regarding the secret engagement agreement. This Court disbarred St. Louis. Fla. Bar v. St. Louis, No. SC04-49, ___ So.2d ___, 2007 WL 1285836 (Fla. May 3, 2007).

FACTS
With regard to Rodriguez, a referee made the following findings and recommendations.
*154 The Firm, DuPont, and the Engagement Agreement. In 1996, the firm represented twenty different plaintiffs in property damages claims against DuPont arising from the use of Benlate. St. Louis, who was the lawyer who brought in the clients for the firm, had primary responsibility for communicating with the clients. Rodriguez's primary role in the Benlate cases was to act as first chair if any of the cases went to trial and to handle significant hearings.
The firm discovered that in the case for one of its clients, Davis Tree Farm, DuPont had concealed its testing of Benlate in Costa Rica. The test plants exhibited significant damage and DuPont ordered the plants to be destroyed. The firm subsequently filed a motion to strike DuPont's pleadings in the Davis Tree Farm case. The trial court judge orally ruled that she would enter an order striking DuPont's pleadings and entered a judgment in favor of Davis Tree Farm.
After the judge made this oral ruling, DuPont approached the firm to try to settle the Davis Tree Farm case, as well as the other Benlate cases the firm was handling. DuPont's attorney negotiated with Rodriguez and St. Louis. At this point, Rodriguez learned that DuPont was requesting as a condition of settlement a restriction on the firm's right to practice. DuPont's counsel stated that settlement of the firm's cases would include resolving the Davis Tree Farm case before the trial judge issued her written order, as well as requiring the firm not to use the fees earned to fund future litigation against DuPont. The firm engaged in research to determine whether it was ethical for the firm to engage in such an agreement. The firm's researcher informed Rodriguez that the law was unclear, but it appeared that DuPont's objective could be achieved by engaging the firm after the firm finished representing the twenty Benlate clients.
DuPont eventually made offers of settlement to nineteen of the Benlate plaintiffs, but not to Davis Tree Farm. The firm was prepared to recommend that the clients accept the offers because the firm believed the offers exceeded what the clients could have reasonably expected to recover if their respective cases had gone to trial. While Rodriguez initially rejected DuPont's request for the firm not to bring future Benlate cases against the corporation, St. Louis told DuPont that in order to have a restriction on the firm's right to practice, DuPont would have to pay the firm. DuPont made settlement of the nineteen Benlate plaintiffs' claims contingent on the settlement of the Davis Tree Farm case.
On August 7, 1996, the trial judge's written order striking DuPont's pleadings arrived in the mail. Settlement negotiations continued and when DuPont's offer reached $30,000,000, the spokeswoman for Davis Tree Farm agreed to accept the offer. Although Rodriguez believed settlement negotiations were complete, DuPont then made the settlement of the nineteen Benlate clients contingent on the firm agreeing to sign an "engagement agreement" that would preclude the firm from bringing future cases against DuPont. Again, Rodriguez declined to enter into such an agreement until the firm's representation of the clients was complete. The firm resisted DuPont's condition until the appointed mediator made it clear that DuPont would retract the offer unless the firm signed such an engagement agreement. The mediator, who had substantial experience in mass tort cases and had been appointed as the Special Master to handle discovery disputes in Benlate-related litigation in Dade County, advised Rodriguez that in these situations, parties *155 would sometimes make an engagement agreement.
After much discussion about the settlement amounts that the firm was going to recommend that the clients accept from DuPont, the firm and DuPont negotiated the restrictions on the right to practice. DuPont agreed to pay the firm $6,445,000 in exchange for the firm's agreement not to pursue future claims against DuPont and for the firm to possibly perform future work for DuPont on an hourly basis. Thus, the $59,000,000 offered to the Benlate plaintiffs and the $6,445,000 offered to the firm through the engagement agreement constituted separate funds. Rodriguez did not participate in drafting the engagement agreement. However, he did not object to the agreement, he agreed with its terms, and he testified that he "negotiated very hard for the $6,445,000." Further, language in the engagement agreement stated that it was contingent upon the effectiveness of the settlement agreement with the Benlate clients.
The referee found that, at this point, Rodriguez became an agent of DuPont, and his allegiance to both DuPont and his Benlate clients created a conflict of interest. Further, the referee found that the firm placed its interest above that of the Benlate clients because (1) the firm avoided the risks and expenses of protracted litigation and possible appeals; (2) the firm received fees from these cases, some of which had fatal flaws; (3) the firm received significant amounts of attorney's fees from the settlements; (4) the firm accepted a guaranteed $6,445,000 in exchange for not pursuing future cases against DuPont; and (5) the firm could return to the "very successful full time practice" of working on an hourly basis with DuPont as an added client.
The referee found that the attorneys of the firm knew or should have known that negotiations for settlements were not concluded until the clients had accepted DuPont's offers and, if the offers were rejected, they would have to resume negotiations. Yet, DuPont's agreement with the firm was conditioned on the consummation of the settlement agreement between DuPont and the firm's clients. The referee found that the statement in the engagement agreement that the firm had "completed the negotiations" indicated that the firm had a desire, if not an intent, not to have any further discussions with DuPont on behalf of its clients.
On August 8, 1996, the parties appeared before the trial judge and announced that a settlement for the Benlate clients had been reached and requested that the judge vacate and seal the order striking DuPont's pleadings. The parties did not inform the judge about the engagement agreement. Also, because all but two of the Benlate clients had the right to accept or reject the settlement, DuPont insisted that the clients only be told the amount that they were being offered to settle their respective cases. DuPont further insisted that the clients keep the amount they received confidential. To enforce these conditions, ten percent of the settlement amounts were to be held in escrow for two years and, should any breach of confidentiality occur, approximately $6,000,000 of the clients' settlement monies would be lost. Rodriguez never told the clients about the engagement agreement. He claimed that because DuPont had insisted on confidentiality, he believed a breach of that confidentiality would result in the clients losing ten percent of the settlement. However, because the settlement agreement between the clients and DuPont was separate from the engagement agreement between the firm and DuPont, the referee found that the confidentiality *156 provisions of the settlement agreement were between the clients and DuPont, and did not bind the firm. Thus, disclosure of the engagement agreement to the clients would not have jeopardized the escrow funds.
The referee found that by not disclosing the agreement, Rodriguez was protecting the firm's interest in $6,445,000, "his own interest in $1,440,000," and DuPont's economic interests in "not having disclosed to the world that it had done some very bad things to its clientele and got caught doing them." Because there was ongoing Benlate litigation occurring around the nation, the latter information potentially could have caused DuPont serious harm.
Rodriguez testified that the money he would receive from the agreements never entered his mind. However, the referee found this to be unlikely because (1) Rodriguez admitted that he found the amounts offered to the clients to be "staggering"; (2) Rodriguez testified that the Benlate clients were clients with "no hope" and would obtain no money had their cases gone to trial; and (3) Rodriguez "received in excess of $4,700,000 from the settlements."
Aftermath of the Settlement and Engagement Agreements. After the terms of the settlement and engagement agreements were agreed upon, St. Louis traveled around the state to meet with clients and convince them to accept DuPont's settlement agreement. St. Louis told the clients that if they did not accept the settlement offer, the firm would no longer represent them. On August 12, 1996, the firm received $6,445,000. Thereafter, on August 16, 1996, the firm received $59,000,000 from DuPont. When one client refused to settle, Rodriguez filed a motion to withdraw representation and a charging lien. At the hearing on this motion, Rodriguez did not tell the judge about the engagement agreement. Rather, he claimed that he wished to withdraw because the client wanted to eliminate Rodriguez's fee. Eventually, the client accepted DuPont's offer and Rodriguez resumed the attorney-client relationship with the client. Rodriguez did withdraw from representing Fred Haupt, another client who refused to settle. Haupt eventually settled with DuPont through his own means.
The referee found that no clients, other than Davis Tree Farm, were made aware of the engagement agreement. Thus, the clients believed that Rodriguez was representing only their interests. Further, the referee found that the firm also kept $393,933.21 of the clients' money. The authorization to settle contained a provision by which the firm kept the interest earned on the clients' settlement funds. The referee found that this provision was not in the best interest of the clients.
1997 Bar Investigation. In 1997, based on the complaint of one of the Benlate plaintiffs, the Bar conducted an investigation into allegations that the firm did not explain to its clients the $59,000,000 original settlement agreement, and that a possible conflict of interest had occurred between the various Benlate clients. The individual who filed the complaint, Robert L. Beasley, alleged that the firm was coercing clients into accepting DuPont's offers, the clients were being held hostage by the firm, and the firm was keeping the interest earned from the clients' settlement funds. Rodriguez contacted attorney Robert Batsel to represent him during this initial Bar investigation, which included a meeting with Bar representatives. Rodriguez and Batsel subsequently testified that the Bar did not ask any questions that called for them to disclose the engagement agreement to the Bar. Rodriguez and Batsel believed the meeting concerned whether there was an improper aggregate settlement *157 with the Benlate clients. Eventually, this earlier disciplinary proceeding resulted in a consent judgment in 1998.
The Instant Complaint. The Bar filed the instant complaint in 2003. Before the referee in these proceedings, Batsel testified that during the 1997 meeting the Bar representatives never posed a question that required Rodriguez to disclose the engagement agreement. Batsel testified that if the Bar had asked questions regarding the engagement agreement during that 1997 investigation, Batsel would have counseled Rodriguez to disclose the agreement. The instant referee found Batsel's testimony credible. Further, the referee found that Rodriguez and Batsel did not conspire to deceive the Bar. The referee did find, however, that Rodriguez should have disclosed the engagement agreement on his own accord during the 1997 investigation.
Findings as to Guilt. Based on these facts, the referee recommended that Rodriguez be found guilty of violating Rules Regulating the Florida Bar 4-1.4(a) (informing client of status of representation), 4-1.4(b) (duty to explain matters to client), 4-1.5(a) (prohibited fees), 4-1.7(a) (representing a client whose interests are adverse to another client), 4-1.7(b) (duty to avoid limitation on independent professional judgment), 4-1.8(a) (business transaction with or acquiring interest adverse to client), 4-1.9(a) (conflict of interest as to former clients), 4-1.16(a)(1) (declining or terminating representation), 4-5.1(c) (responsibilities of a partner for rules violations), 4-5.6(b) (restriction on lawyer's right to practice), and 4-8.4(a) (lawyer shall not violate or attempt to violate the Rules of Professional Conduct). In making these recommendations, the referee specifically rejected the following defenses raised by Rodriguez: (1) he was only following the advice of counsel; (2) he believed he was acting in his clients' best interests; (3) client confidentiality prevented him from disclosing the engagement agreement to the Benlate clients and the Bar; (4) the Bar is at fault in this matter; and (5) DuPont is responsible for these acts of misconduct.
Disciplinary Recommendations. In aggravation, the referee found the sole factor of multiple offenses. In mitigation, the referee found (1) Rodriguez's lack of a disciplinary history; (2) his remorse; (3) his inexperience in handling settlements of multiple-plaintiff mass tort cases; (4) his interim rehabilitation; (5) the length of time during which Rodriguez has had to deal with various proceedings and negative publicity arising out of the DuPont settlement; (6) the emotional, financial, and physical stress Rodriguez has suffered for over eight years as a result of his misconduct; (7) the excellent results Rodriguez obtained for the Benlate clients;[2] and (8) *158 Rodriguez's character and outstanding reputation in the community.
As to discipline, the referee recommended that Rodriguez (1) serve a four-year probationary period, during which he would perform 1000 hours of pro bono legal services; (2) receive a public reprimand; and (3) pay the Bar's costs. The referee stated that the recommended discipline is a constructive sanction that will help the less fortunate in the community and that "[s]uspending [Rodriguez] from the practice of law will not accomplish any worthy objective."
Before the referee, the Bar requested that Rodriguez be ordered to forfeit $1,600,000 from his prohibited fee to the Clients' Security Fund of The Florida Bar. The referee concluded that the Bar was seeking forfeiture of the funds more as a fine than as restitution for money taken from the Benlate clients. The referee stated that there is no authority in a Bar disciplinary proceeding to require payment that is not for restitution or payment of costs. Further, the referee found that payment of such an amount by Rodriguez would be punitive in nature.
On Review. Rodriguez petitioned this Court for review of the referee's report, alleging that the Bar's claims in the instant case are an impermissible collateral attack on the 1998 consent judgment entered into by Rodriguez and the Bar. The Bar filed a cross-petition, challenging the referee's recommended discipline and the referee's recommendation that Rodriguez not be required to forfeit money to the Clients' Security Fund.

ANALYSIS
First, Rodriguez asserts that The Florida Bar's claims in the instant case are barred by the doctrine of res judicata and, in turn, the referee's findings of certain rule violations should not be approved. He bases this claim on the 1998 consent judgment that he negotiated with the Bar. Rodriguez claims that the consent judgment resolved all disciplinary matters relating to the firm's twenty Benlate clients, and that it therefore prevents the Bar from bringing this case. Based on this premise, Rodriguez argues that the instant referee erred in denying Rodriguez's motion for summary judgment. Further, Rodriguez notes that the grievance that generated the first disciplinary proceeding raised the issue of the firm keeping the interest on the settlement monies that were to go to the clients. Therefore, Rodriguez concludes that the Bar could have alleged a violation of rule 4-1.8(a) at that time, so the referee's instant recommendation of a violation of the rule on that same basis is barred by res judicata.
Rodriguez's claim that the Bar was precluded from bringing a second complaint, based on the firm's secret engagement agreement with DuPont, is without merit. The doctrine of res judicata applies when all four of the following conditions are present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) "identity of quality in persons for or against whom claim is made." McGregor v. Provident Trust Co. of Philadelphia, 119 Fla. 718, 162 So. 323, 328 (1935); see also Palm AFC Holdings, Inc. v. Palm Beach County, 807 So.2d 703, 704 (Fla. 4th DCA 2002). Thus, the causes of action must be closely related for the doctrine of res judicata to apply. See Hay v. Salisbury, 92 Fla. 446, 109 So. 617, 621 (1926).
While both the previous and current disciplinary proceedings stem from Rodriguez's representation of the Benlate clients in a lawsuit against DuPont, the previous case focused on how the firm *159 dealt with its clients and whether the firm improperly negotiated an aggregate settlement for the clients. In contrast, the current case is based on the engagement agreement that the firm arranged with DuPont. Where "the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." Gray v. Gray, 91 Fla. 103, 107 So. 261, 262 (1926) (quoting Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1876)). Thus, the current case is not barred by res judicata as it is based on a different cause of action, i.e., Rodriguez's relationship with DuPont.[3]See Fla. Bar v. Gentry, 447 So.2d 1342 (Fla.1984) (holding that there was no identity of facts for res judicata to bar the proceedings where the subsequent Bar allegations were based on separate, additional, and continuing misconduct). Further, Rodriguez did not disclose or produce the secret engagement agreement in the course of the Bar's 1997-98 investigation. As this engagement agreement never came to light and the Bar did not suspect its existence, Rodriguez cannot be rewarded in this case for previously hiding this matter from the Bar and this Court. See Fla. Bar v. Spears, 786 So.2d 516, 520 (Fla.2001) (finding that the exclusion of the present disciplinary matter from a prior judgment was solely attributable to Spears' failure to bring the matter to the Bar's attention).
Based on the doctrine of res judicata, however, we disapprove the referee's finding that Rodriguez violated rule 4-1.8(a) when the firm retained the interest earned on the clients' escrow funds. In its Answer Brief and Initial Brief on Cross Appeal in the instant case, the Bar admits that one of the main issues in the earlier proceedings was that Rodriguez "and his partners . . . [were] keeping interest earned on the clients' settlement proceeds." Thus, the Bar was aware of this issue, but failed to fully pursue it in the earlier case regarding the firm's dealings with its Benlate clients. Further, this rule violation is based on the firm's settlement agreement with the Benlate clients, rather than its engagement agreement with DuPont. Accordingly, based on res judicata, we disapprove the referee's finding of this rule violation.
Second, the Bar argues that the referee's recommended disciplinary sanctions are not supported by caselaw or the standards for imposing lawyer sanctions. In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because it is the Court's ultimate responsibility to order the appropriate sanction. See Fla. Bar v. Anderson, 538 So.2d 852, 854 (Fla.1989); see also art. V, § 15, Fla. Const. ("The supreme court shall have exclusive jurisdiction to regulate . . . the discipline of persons admitted [to the practice of law]."). Generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing caselaw and the Florida Standards for Imposing Lawyer Sanctions. See Fla. Bar v. Temmer, 753 So.2d 555, 558 (Fla.1999). In the instant case, we agree with the Bar *160 that the referee's recommendations are not supported.
A two-year suspension, rather than a public reprimand, is the appropriate sanction under these circumstances. Florida Standard for Imposing Lawyer Sanctions 4.32 states that "[s]uspension is appropriate when a lawyer knows of a conflict of interest and does not fully disclose to a client the possible effect of that conflict, and causes injury or potential injury to a client." Rodriguez violated this standard and exposed the Benlate clients to potential harm. He was a knowing party to the engagement agreement, he did not disclose the conflict of interest to his clients, and his interests were clearly divided. He protected his interest in the engagement agreement by engaging in actions that were contrary to the interests of his own clients. A suspension is appropriate in conflict of interest situations which, as here, rise above mere negligence. See e.g., Fla. Bar v. Dunagan, 731 So.2d 1237 (Fla.1999) (upholding ninety-one-day suspension where, without wife's consent, lawyer represented husband in dissolution proceeding although the lawyer had previously represented both husband and wife in a business matter).
Additionally, standard 7.2 provides for suspension "when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system." Fla. Stds. Imposing Law. Sancs. 7.2. Rodriguez's conflict of interest with respect to the Benlate clients caused the clients harm. Further, he potentially harmed the public by forming an agreement with DuPont not to pursue future lawsuits against DuPont. Also, he potentially harmed the legal system by not disclosing the engagement agreement to the Bar during the previous disciplinary proceedings.
Rodriguez's misconduct does not rise to the same level of egregiousness as that of his former partner St. Louis. See Fla. Bar v. St. Louis, No. SC04-49, ___ So.2d ___, 2007 WL 1285836 (Fla. May 3, 2007) (disbarring St. Louis). St. Louis engaged in additional acts of misconduct, such as drafting the engagement agreement, signing the engagement agreement on behalf of the firm, deliberately lying to a circuit court judge, making dishonest written statements to Bar representatives, and specifically refusing to advise certain clients in response to their inquiries. Nevertheless, Rodriguez still engaged in extremely serious misdeeds. He was scheduled to serve as first chair if any of the Benlate cases went to trial and he was responsible for the significant hearings. Yet to satisfy his own greed, he engaged in actions that directly conflicted with the interests of his clients. He became an agent for DuPont while still representing his Benlate clients against DuPont. In fact, due to the funds that were held in escrow to prevent any breach of confidentiality, the firm represented the Benlate plaintiffs as a fiduciary (the escrow agent) for two years after signing the engagement agreement. Thus, Rodriguez was representing adverse interests because he was on retainer to DuPont during that two-year period.
Davis Tree Farm was the only client aware of the engagement agreement. The other nineteen clients believed that Rodriguez was representing only their interests. However, Rodriguez's interests were clearly divided. When one client refused to settle, Rodriguez filed a motion to withdraw and filed a charging lien. Rodriguez alleged that he wished to withdraw because the client wanted to eliminate Rodriguez's fee. Rodriguez did not disclose the engagement agreement to the judge. Further, *161 Rodriguez withdrew from representing another client who refused to settle.
When Rodriguez entered into the engagement agreement, he violated rule 4-5.6(b)(restriction on the right to practice). The rule was adopted by this Court in 1986. See Fla. Bar re Rules Regulating Fla. Bar, 494 So.2d 977, 1069 (Fla.1986). The rule was firmly established by the time Rodriguez entered into the engagement agreement ten years later in 1996. Further, the rule is clear and unambiguous in its language:
Restrictions on right to practice
A lawyer shall not participate in offering or making . . .
(b) an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a controversy between private parties.
R. Regulating Fla. Bar 4-5.6(b)(1986). Attorneys who engage in such engagement agreements receive severe sanctions, even when the misconduct is far less egregious than that in the instant case. See In re Brandt, 331 Or. 113, 10 P.3d 906 (2000) (imposing thirteen- and twelve-month suspensions on two lawyers, one with a prior disciplinary record and the other without, for entering into a side agreement with the adversary to act as legal counsel); In re Hager, 812 A.2d 904 (D.C.2002) (suspending for one year a lawyer who, while representing fifty clients against a manufacturer, secured a side agreement with the manufacturer involving restricting his right to practice, dropping the pending case, and maintaining confidentiality). In light of the severe sanctions imposed on attorneys who have engaged in side agreements and Rodriguez's serious misconduct, we conclude that a two-year suspension is the appropriate sanction.
In addition, we conclude that the referee's recommendation of a four-year period of probation is inconsistent with Rule Regulating the Florida Bar 3-5.1(c). The rule permits probation for periods up to three years "or for an indefinite period determined by conditions stated in the order." The referee's recommendation exceeds three years and is not based on "conditions stated in the order." Thus, the referee's recommendation of a four-year period of probation is impermissible under the rule. Further, in light of the two-year suspension, we disapprove the referee's recommendation of probation and the accompanying terms and conditions.
Third, the Bar asserts the referee's recommendation that Rodriguez not be required to forfeit the funds acquired through a prohibited fee (the engagement agreement) is erroneous pursuant to rule 3-5.1(h). We agree. As we discussed in the companion case of Florida Bar v. St. Louis, No. SC04-49, ___ So.2d ___, 2007 WL 1285836 (Fla. May 3, 2007), the proceeds from the engagement agreement are a prohibited fee that are addressed by rule 3-5.1(h). The rule provides, in pertinent part:
Forfeiture of Fees. An order of the Supreme Court of Florida or a report of minor misconduct adjudicating a respondent guilty of entering into, charging, or collecting a fee prohibited by the Rules Regulating The Florida Bar may order the respondent to forfeit the fee or any part thereof. . . . [A] fee otherwise prohibited by the Rules Regulating The Florida Bar may be ordered forfeited to The Florida Bar Clients' Security Fund and disbursed in accordance with its rules and regulations.
R. Regulating Fla. Bar 3-5.1(h) (emphasis added). This Court approved rule 3-5.1(h) in 1990. See Fla. Bar Petition to Amend the Rules Regulating the Fla. BarAdvertising Issues, 571 So.2d 451, 472 (Fla. 1990). Thus, the clear language of the *162 rule had been in effect for several years when Rodriguez entered into the engagement agreement in 1996.
Pursuant to rule 3-5.1(h), it is appropriate for Rodriguez to disgorge the prohibited fee to the Clients' Security Fund. Further, permitting Rodriguez to retain his ill-gotten gains would fail to provide a deterrent and could actually encourage misconduct by greedy lawyers. See In re Hager, 812 A.2d 904 (D.C.2002); In re Hager, 878 A.2d 1246 (D.C.2005).
Based on the clear language in rule 3-5.1(h) and caselaw, we disapprove the referee's recommendation that Rodriguez be permitted to retain the prohibited fee. Instead, we require Rodriguez to disgorge the prohibited fee into the Clients' Security Fund. We direct that the total amount for disgorgement include the amount Rodriguez paid in taxes, as he can seek a refund of those taxes from the Internal Revenue Service. Further, we require Rodriguez to disgorge interest on the full amount of the prohibited fee. Interest shall be calculated as starting on August 12, 1996, the date the firm received the $6,445,000.
The referee stated that the amount he considered when examining the issue of disgorgement "was in excess of $1,600,000," yet the referee also stated that Rodriguez was protecting "his own interest in $1,440,000." Clearly, the referee did not make a finding as to a precise amount. Further, before this Court, the Bar has presented the amounts of $1,600,000 and $935,040. Thus, as this Court has not been presented with an ultimate specific amount, which includes taxes and interest, we remand this matter to the referee solely to determine the total amount for disgorgement. We direct the referee to consider Florida Bar v. St. Louis, No. SC04-49, ___ So.2d ___, 2007 WL 1285836 (Fla. May 3, 2007), in making this determination.

CONCLUSION
Accordingly, Francisco Ramon Rodriguez is suspended from the practice of law in Florida for two years. The suspension will be effective thirty days from the filing of this opinion so that Rodriguez can close out his practice and protect the interests of existing clients. If Rodriguez notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the suspension effective immediately. Rodriguez shall accept no new business from the date this opinion is filed until he is reinstated.
Further, as the referee did not find a specific amount for disgorgement that includes taxes and interest, this Court hereby remands that issue to the referee as the finder of fact to determine the total amount for disgorgement.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Francisco Ramon Rodriguez in the amount of $45,258.88, for which sum let execution issue.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The referee did not make a clear finding as to the specific amount that he considered for disgorgement. There are some references in the referee's report to $1,440,000, and at other points the report states that the amount "was in excess of $1,600,000." We remand this issue to the referee to determine the appropriate amount for disgorgement.
[2] In contrast to the referee's finding, this Court has repeatedly refused to find a mitigating factor based on a respondent's assertion that he engaged in misconduct in order to produce benefits for his client or a third party. See Fla. Bar v. Kelner, 670 So.2d 62, 63 (Fla.1996) (explaining that although an attorney has a duty to zealously represent his clients, this duty does not require that he violate a court order and produce a mistrial); Fla. Bar v. Rendina, 583 So.2d 314, 316 (Fla. 1991) (disbarring attorney for attempting to bribe an official to obtain a lesser criminal sentence for his client); Fla. Bar v. Rambo, 530 So.2d 926 (Fla.1988) (sanctioning attorney for bribing county official to receive favorable rezoning of a client's property); Fla. Bar v. Snow, 436 So.2d 48, 49 (Fla.1983) (suspending attorney who, in attempting to effect a favorable settlement in a civil case for his clients, obtained evidence by false representations); Fla. Bar v. Riccardi, 264 So.2d 5 (Fla.1972) (disbarring attorney for bribing tax agent to influence the determination of tax liability of a third party). Thus, we disapprove the referee's finding of this factor in mitigation.
[3] Rodriguez argues that the language of the 1998 consent judgment precludes the subsequent disciplinary action against him. The consent judgment states that it "concludes any Bar investigation into all of the firm's twenty (20) Benlate clients." A plain reading of this language demonstrates that the consent judgment addressed matters regarding the firm's dealings with its Benlate clients and the settlement for those clients. The language does not refer to the firm's secret engagement agreement with DuPont.