897 So.2d 1269 (2005)
THE FLORIDA BAR, Complainant/Cross-Respondent,
v.
David A. BARRETT, Respondent/Cross-Complainant.
No. SC03-375.
Supreme Court of Florida.
March 17, 2005.
*1271 John F. Harkness, Jr., Executive Director, John Anthony Boggs, Staff Counsel, Thomas Gary, Chair, Second Judicial Circuit Grievance Committee, and James A.G. Davey, Jr., Bar Counsel, The Florida Bar, Tallahassee, FL, for Complainant/Cross-Respondent.
John A. Weiss of Weiss and Etkin, Tallahassee, FL and W.O. Birchfield of Birchfield and Humphrey, P.A., Jacksonville, FL, for Respondent/Cross-Complainant.
PER CURIAM.
We have for review a referee's report regarding alleged ethical breaches by attorney David A. Barrett. We have jurisdiction. See art. V, § 15, Fla. Const. We approve the referee's findings of fact and recommendations as to guilt. For the reasons explained below, we decline to approve the recommended sanction of a one-year suspension and instead disbar Barrett.

I. FACTS
The Florida Bar filed a complaint against respondent David A. Barrett, alleging numerous counts of misconduct involving two unethical schemes to solicit clients. After a multiple-day hearing, the referee issued a report making the following findings and recommendations.
Barrett was the senior partner and managing partner in the Tallahassee law firm of Barrett, Hoffman, and Hall, P.A. In approximately January 1993, Barrett hired Chad Everett Cooper, an ordained minister, as a "paralegal." Although Cooper had previously worked for a law firm in Quincy, Florida, Cooper's primary duty at Barrett's law firm was to bring in new clients. As Cooper testified, Barrett told him to "do whatever you need to do to bring in some business" and "go out and ... get some clients." Cooper was paid a salary averaging $20,000 and, in addition to his salary, yearly "bonuses" which generally exceeded his yearly salary. In fact, Cooper testified that Barrett offered him $100,000 if he brought in a large case.
To help Cooper bring in more personal injury clients to the law firm, Barrett devised a plan so that Cooper could access the emergency areas of a hospital and thus be able to solicit patients and their families. In order to gain such access, Barrett paid for Cooper to attend a hospital chaplain's course offered by Tallahassee Memorial Hospital.
In approximately March of 1994, Molly Glass's son was critically injured when he was struck by an automobile while on his bicycle. While her son was being treated in the intensive care unit at Tallahassee Memorial Hospital, Cooper met the Glass family. Cooper, who dressed in "clothing that resembled a pastor," identified himself to the family as a chaplain and offered to pray with them. Thereafter, Cooper gave a family member of Molly Glass the business card of attorney Eric Hoffman, one of the partners in Barrett's law firm, and suggested that the family call the firm. Neither Barrett nor Cooper knew Molly Glass prior to Cooper's solicitation at the hospital. After her son died, Molly Glass retained Barrett's law firm in a wrongful death action. A settlement was negotiated, and she was pleased with the result until May of 1999, when she read a newspaper article about improper solicitation of clients and realized that Cooper's actions in the hospital constituted inappropriate *1272 solicitation. The referee specifically found that Cooper was Barrett's agent at the time that Cooper solicited Molly Glass and that Barrett ordered the conduct and ratified it by paying Cooper a salary and bonuses.
In April 1994, Cooper referred his friend, Terry Charleston, to Barrett's law firm. Charleston was an automobile accident victim whose injuries left him a quadriplegic. After the case was settled for over $3 million, Cooper was paid a bonus that year of $47,500.[1] Barrett attempted to justify the extremely large bonus, contending that the bonus was based on personal services, pastoral services, and companionship that Cooper provided to Charleston. The referee rejected this explanation, finding that Barrett lied about the reason for the bonus. Instead, the referee found that Barrett gave Cooper the bonus for bringing in the case, and thus Barrett engaged in an illegal fee-splitting plan.
On September 19, 1997, Barrett, who had the ultimate authority for hiring and firing in his law firm, fired Cooper. In the words of Barrett's now-deceased partner, Eric Hoffman, Barrett fired Cooper because "it was getting pretty hot and he was afraid that everyone would get caught."[2] However, even after Cooper was fired, his relationship with Barrett did not end.
While Cooper obtained accident reports and solicited patients for a chiropractor, he also continued to solicit clients for Barrett. After the patients were seen by the chiropractor, the accident reports were forwarded to Barrett's law partner, Hoffman. Cooper was paid $200 for each client who was brought into the law firm. The referee specifically found that Barrett knew about this scheme and that he ratified the conduct of Hoffman and Cooper. Barrett micromanaged the office, especially the finances, and personally signed the checks to Cooper in the amount of $200 per client for soliciting eight clients. Moreover, Barrett inquired as to whether there was insurance coverage before authorizing the firm's checks written to Cooper for soliciting clients. In addition to Molly Glass, the referee found that Barrett improperly solicited twenty-one other clients in violation of the Rules of Professional Conduct.
Finally, in May 1996, Barrett sent Cooper to Miami and Chicago in order to solicit clients as a result of the Value Jet airplane crash in the Everglades. Although Barrett denied any knowledge about this, his own business records show that $974.24 was paid for Cooper's travel expenses. The referee found that Barrett's testimony regarding this matter was not credible. While neither solicitation resulted in clients for Barrett's firm, the referee concluded these were inappropriate solicitation attempts directed by Barrett.
Based on the above factual findings, the referee found that Barrett was guilty of violating the following sections of the Rules Regulating the Florida Bar: 4-5.l(c)(1) (responsibilities of a partner); 4-5.3(b)(3)(A) (responsibilities regarding nonlawyer assistants); 4-5.4(a)(4) (sharing fees with nonlawyers); 4-7.4(a) (solicitation); 4-8.4(a) (violating or attempting to violate the rules of professional conduct); 4-8.4(c) (engaging in conduct involving deceit); and 4-8.4(d) (engaging in conduct in connection with the practice of law that is *1273 prejudicial to the administration of justice). In turning to the recommended discipline, the referee found the following aggravating circumstances applied in this case: (1) Barrett had a dishonest or selfish motive; (2) he exhibited a pattern of misconduct; (3) he was guilty of multiple offenses; (4) he submitted false statements during the disciplinary process by lying to the referee; (5) the victim was in a vulnerable condition; and (6) Barrett had substantial experience in the practice of law. As to mitigation, the referee found that four mitigating circumstances applied here: (1) Barrett did not have a prior disciplinary record; (2) he made full and free disclosure to the disciplinary board or had a cooperative attitude toward the proceedings; (3) character witnesses testified to Barrett's good character and reputation; and (4) Barrett exhibited remorse as to the effect of his conduct upon his family, friends, and clients. After considering the foregoing aggravating and mitigating factors, the referee recommended that Barrett be suspended from the practice of law for one year and be ordered to pay the Bar's costs.
The Florida Bar appeals to this Court, contending that we should increase the discipline to disbarment. Respondent cross-appeals and challenges whether (1) the referee made independent findings of fact; (2) the referee improperly denied several preliminary motions; (3) there is sufficient proof to support the referee's findings of fact; and (4) the sentence is excessive in light of our previous Bar discipline decisions. Since Barrett challenges both the findings of fact and the recommended discipline, we address the cross-appeal first.

II. ANALYSIS
Sufficiency of the Referee's Report
In his first claim, Barrett requests that this Court disregard the referee's findings of fact because the referee adopted verbatim the Bar's proposed findings of fact without first making any prior pronouncements on the factual issues before him, and thus, the referee's findings do not reflect the judge's independent decision-making. In support of his contentions, Barrett alleges that Florida courts have condemned trial judges for blindly adopting orders submitted by one party without first making factual findings on the record. See Perlow v. Berg-Perlow, 875 So.2d 383, 388 n. 4 (Fla.2004); Rykiel v. Rykiel, 795 So.2d 90, 92 (Fla. 5th DCA 2000), quashed on other grounds, 838 So.2d 508 (Fla.2003); Waldman v. Waldman, 520 So.2d 87, 89 (Fla. 3d DCA 1988), receded from on other grounds by Acker v. Acker, 821 So.2d 1088 (Fla. 3d DCA 2002), review granted, 842 So.2d 842 (Fla.2003).
The record does not support Barrett's contentions that the referee failed to make his findings on the record before adopting the proposed report. The record shows that after defense counsel requested that the referee make specific findings of fact prior to the next hearing, the referee informed both parties that he found that Barrett knew about and participated in the solicitation schemes, that Barrett was also vicariously responsible, and that the referee's subsequent report would find that the Bar had sufficiently proved all of the allegations contained in its complaint. The Bar submitted the proposed findings of fact, which contained statements similar to those contained in its initial complaint.
This Court has already rejected Barrett's argument in Florida Bar v. Cramer, 678 So.2d 1278 (Fla.1996). In that case, this Court held that the referee did not err when it adopted the Bar's proposed findings, particularly in light of the fact that the referee first announced his findings as *1274 to guilt and further stated that he intended to adopt the allegations of the Bar. Id. at 1279. Since the record shows that the referee in the case before us made his findings on the record before adopting the proposed report, we likewise find the referee here did not err.

Preliminary Motions
Next, Barrett contends that the referee erred in denying several of his preliminary motions, including two motions to dismiss and a motion to strike the testimony of Molly Glass. Barrett first challenges the referee's denial of his motion to dismiss the Bar's entire case when the Bar withdrew the allegations relating to Frances Brown.[3] According to Barrett, when the Bar withdrew the Brown allegations, all of the charges were essentially withdrawn because the case number assigned to the Brown allegations encompassed the entire Bar complaint.
We find Barrett's argument to be without merit. The fact that the Bar withdrew the allegations relating to Brown from the disciplinary proceedings and that the case number assigned to the Brown complaint included the other complaints against Barrett did not require the remainder of the allegations contained in the Bar's complaint to be withdrawn. While the Brown allegations were withdrawn, the remainder of the allegations remained in full force.
Barrett next argues that the reference to Molly Glass in the complaint was impermissible since that claim was barred by the six-year statute of limitations which is provided in Rule Regulating the Florida Bar 3-7.16(a). This argument is incorrect. The improper solicitation concerning Molly Glass occurred in approximately March 1994; however, rule 3-7.16 was not adopted until 1995. See Fla. Bar re Amendments to Rules Reg. Fla. Bar, 658 So.2d 930 (Fla.1995) (adopting rule 3-7.16). Accordingly, the statute of limitations is not applicable here. See, e.g., Florida Bar v. Walter, 784 So.2d 1085, 1086 (Fla.2001) (rule 3-7.16 not applicable where misconduct occurred prior to adoption of statute of limitations). Instead, the only issue remaining is whether the Bar proceeded within a "reasonable time" in filing its complaint against Barrett, a question which leads us into Barrett's next argument.
Specifically, Barrett challenges the referee's denial of his motion to dismiss based on prosecutorial delay, contending that his case is similar to and should be controlled by the decision of Florida Bar v. Walter, 784 So.2d 1085 (Fla.2001). In Walter, we dismissed disciplinary proceedings where the prosecutorial delay lasted seven years. We noted that, although it was a "close call," the Bar did not act within a "reasonable time" in taking seven years to file its complaint. Id. at 1087. In that opinion, we pointed out that the dismissal was a result of the "unique circumstances" of Walter's case.
We agree with the Bar that the delay in the instant case was the result of an ongoing joint investigation between the Bar and the Fraud Division of the Florida Department of Insurance. Evidence in the record and from the referee's findings of fact supports the assertion that the Bar actively pursued its claim against Barrett during this period of time. Accordingly, *1275 we hold that any delay in proceeding in this case was insufficient under the circumstances of this case.

Findings of Fact
Next, Barrett challenges numerous aspects of the referee's findings of fact, contending that the Bar did not prove his misconduct by clear and convincing evidence. Barrett argues that the referee erred in finding that (1) Chad Cooper's job did not involve paralegal work; (2) Barrett was responsible for devising an improper plan to bring in more clients; (3) Cooper was Barrett's agent, over whom Barrett had direct supervisory authority; (4) Barrett lied during his testimony about the bonuses to Cooper; (5) Cooper was fired because Barrett did not want to get caught; (6) Cooper solicited clients after he was fired from Barrett's firm; (7) Barrett improperly solicited twenty-one clients; and (8) Barrett sent Cooper to Miami and Chicago to improperly solicit clients. We disagree.
When this Court reviews a referee's factual findings, our standard of review is as follows:
A referee's findings of fact regarding guilt carry a presumption of correctness that should be upheld unless clearly erroneous or without support in the record. Absent a showing that the referee's findings are clearly erroneous or lacking in evidentiary support, this Court is precluded from reweighing the evidence and substituting its judgment for that of the referee.
Florida Bar v. Spann, 682 So.2d 1070, 1073 (Fla.1996) (citations omitted). The objecting party carries the burden of showing that the referee's findings of facts are clearly erroneous. Florida Bar v. Miele, 605 So.2d 866, 868 (Fla.1992). Barrett cannot satisfy this burden by simply pointing to contradictory evidence when there is also competent, substantial evidence in the record that supports the referee's findings. Florida Bar v. Vining, 761 So.2d 1044, 1048 (Fla.2000). While there may be conflicting evidence, the overwhelming record evidence supports the referee's findings of fact. Therefore, we reject Barrett's contention that the findings of fact in the referee's report are not properly supported by the evidence. Because competent, substantial evidence in the record supports the referee's findings, we adopt the findings of fact and further approve without further discussion the referee's recommendation that Barrett be found guilty of violating the above rules.

Discipline
Both parties appeal the recommended discipline of a one-year suspension. Barrett argues that a twenty-day suspension is appropriate based on previous solicitation cases. The Bar argues that the appropriate discipline for such egregious ethical misconduct is disbarment. We agree with the Bar.
When reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because this Court has the ultimate responsibility to determine the appropriate sanction. Florida Bar v. McFall, 863 So.2d 303, 307 (Fla.2003). In determining a proper sanction, the Court will take into consideration the three purposes of lawyer discipline.
First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. *1276 Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
Florida Bar v. Lord, 433 So.2d 983, 986 (Fla.1983) (emphasis omitted). As a general rule, when evaluating a referee's recommended discipline, the Court will not second-guess a referee's recommended discipline as long as that discipline (1) is authorized under the Florida Standards for Imposing Lawyer Sanctions (the Standards), and (2) has a reasonable basis in existing case law. McFall, 863 So.2d at 307.
Our cases involving unethical solicitation of clients have imposed a wide variety of discipline depending on the specific facts of each case. See, e.g., Florida Bar v. Wolfe, 759 So.2d 639 (Fla.2000) (one-year suspension); Florida Bar v. Weinstein, 624 So.2d 261 (Fla.1993) (disbarment); Florida Bar v. Stafford, 542 So.2d 1321 (Fla.1989) (six-month suspension); Florida Bar v. Sawyer, 420 So.2d 302 (Fla.1982) (eighteen-month suspension); Florida Bar v. Gaer, 380 So.2d 429 (Fla.1980) (public reprimand). Moreover, the Standards authorize either disbarment or suspension in such circumstances, depending on the amount of harm or potential harm caused and on whether the conduct was intentional versus knowing. Compare Fla. Stds. Imposing Law. Sancs. 7.1 with Fla. Stds. Imposing Law. Sancs. 7.2.
Barrett argues that he should receive the same discipline (a twenty-day suspension) ordered in two previous unpublished decisions that involved improper solicitations: Florida Bar v. Vanture, 833 So.2d 775 (Fla.2002) (table report of unpublished order), and Florida Bar v. Flowers, 826 So.2d 993 (Fla.2002) (table report of unpublished order). He further alleges that discipline is completely unwarranted because the facts of the case do not support that Barrett was responsible for the improper schemes. The referee found that Barrett was responsible for the misconduct based on findings that he personally directed some of the solicitations and because he ratified all of the misconduct. As addressed above, these findings are supported by competent, substantial evidence.
We find that the facts of this case are substantially similar to those in the case of Weinstein. In Weinstein, the attorney personally solicited a critically injured patient in his hospital room, using lies and deception to gain entrance into the room. 624 So.2d at 261-62. Further, the attorney gave false or misleading testimony under oath regarding his improper solicitations. We stated that
in-person solicitation of a [critically injured] patient in a hospital room, accompanied by lying to health-care personnel, [is] one of the more odious infractions that a lawyer can commit; his conduct brings his profession into disrepute and reduces it to a caricature. Disbarment is the appropriate sanction in the aggravated circumstances of this case.
Id. at 262.
Similarly, Barrett used deception to gain access to hospital patients by paying for Cooper to complete a hospital chaplain's course and sending him under the guise of providing spiritual comfort to people in their most needy time, when at the time Cooper was an attorney's employee being paid to obtain clients. Barrett then changed his scheme when "it was getting pretty hot," instead relying on Cooper to obtain clients while he worked for a chiropractor. His schemes resulted in twenty-two improperly solicited clients. Additionally, Barrett also engaged in an illegal fee-splitting plan with Cooper. The conduct in this case is clearly as egregious as the conduct in Weinstein. Moreover, this is not a situation where Barrett failed to *1277 realize his actions were wrong; he engaged in the conduct intentionally and then fired Cooper when he became concerned about the possibility of being caught. As this Court has held, when an attorney "affirmatively engages in conduct he or she knows to be improper, more severe discipline is warranted." Florida Bar v. Wolfe, 759 So.2d 639, 645 (Fla.2000). Finally, the instant case had substantial aggravating circumstances, including that (1) Barrett engaged in this type of improper solicitations based on a selfish motive to obtain clients; (2) the improper solicitations were a part of organized schemes that lasted for years; (3) multiple offenses occurred, including two different schemes which led to at least twenty-two improper solicitations; (4) Barrett lied to the referee during the proceedings; (5) one of the victims was especially vulnerable and in fact retained Barrett's law firm only because she was angry that somebody else had tried to take advantage of her during a time in which she was clearly preoccupied with her son's critical injuries;[4] and (6) Barrett had substantial experience in the practice of law. While the referee did find that mitigating circumstances applied, these pale by comparison to the aggravating circumstances in this case. Any discipline less than disbarment is far too lenient based on the amount and type of misconduct which occurred here and would not fulfill the three purposes of lawyer discipline.
In sum, members of The Florida Bar are ethically prohibited from the solicitation of clients in the manner engaged in by Barrett. The Court expects that its rules will be respected and followed. This type of violation brings dishonor and disgrace not only upon the attorney who has broken the rules but upon the entire legal profession, a burden that all attorneys must bear since it affects all of our reputations. Moreover, such violations harm people who are already in a vulnerable condition, which is one of the very reasons these types of solicitations are barred. Therefore, this Court will strictly enforce the rules that prohibit these improper solicitations and impose severe sanctions on those who commit violations of them.

III. CONCLUSION
We approve the referee's findings of fact and recommendations as to guilt, but we decline to approve the recommended discipline of a one-year suspension and instead disbar respondent. Accordingly, David A. Barrett is hereby disbarred from the practice of law in the State of Florida. The disbarment will be effective thirty days from the date this opinion is filed so that Barrett can close out his practice and protect the interests of existing clients. If Barrett notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. Barrett shall accept no new business after this opinion is filed.
Judgment is entered in favor of The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399, for recovery of costs from David A. Barrett in the amount *1278 of $16,156.67, for which sum let execution issue.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Since Cooper knew Charleston before referring him to the law firm, the only issue raised to the referee was whether Barrett had engaged in an improper fee-splitting plan with a nonlawyer.
[2] Sandra Scott, a legal assistant at respondent's law firm, testified that Hoffman made this statement to her.
[3] At the conclusion of the first day of the final hearing, counsel for the Bar stated:

Your Honor, before we proceed, I would like to advise the Referee that The Florida Bar will no longer pursue in the complaint paragraphs 12, 13 or 14. Mr. Cooper's testimony today [that he only gave Brown the number to the church where Cooper was a pastor and not the telephone number to Respondent's law firm] comports with what he told me last night. I believe him.
[4] Molly Glass was in a precarious emotional state, sitting in a bedside vigil while her son was fighting for his life. During this time, a potential defendant attempted to exploit this very weakness, offering to pay her $10,000 if she signed a release agreeing not to sue. Molly Glass, infuriated that someone would attempt to take advantage of her while in the midst of such a tragedy, turned to somebody she thought she could trust to help her, an attorney that was recommended to her by a hospital chaplain, only to realize years later that her attorney also exploited this very same vulnerability in order to obtain her business.