967 So.2d 108 (2007)
THE FLORIDA BAR, Complainant,
v.
Roland Raymond ST. LOUIS, Jr., Respondent.
No. SC04-49.
Supreme Court of Florida.
May 3, 2007.
*111 John F. Harkness, Jr., Executive Director, Kenneth Lawrence Marvin, Director of Lawyer Regulation, and James A.G. Davey, Jr., Bar Counsel, The Florida Bar, Tallahassee, FL, for Complainant.
Roland Raymond St. Louis, Jr., pro se, Coral Gables, FL, for Respondent.
PER CURIAM.
We have for review a referee's report recommending that Roland Raymond St. Louis, Jr., be found guilty of professional misconduct for violating a number of the Rules Regulating the Florida Bar. The referee is recommending several sanctions, the most significant of which are a sixty-day suspension, probation for three years, and forfeiture of $2,277,663 to The Florida Bar's Clients' Security Fund. We have jurisdiction. See art. V, § 15, Fla. Const.
For the reasons explained herein, we disapprove the referee's recommendation that St. Louis be suspended. Instead, we impose disbarment. Further, in addition to disgorgement of $2,277,663, we order St. Louis to pay interest on that amount.

BACKGROUND
St. Louis was a shareholder in the law firm of Friedman, Rodriguez, Ferraro, and St. Louis (FRF & S). The firm was hired to represent twenty clients who sought to sue DuPont Corporation for damages allegedly resulting from use of the DuPont product Benlate, a fungicide that was suspected of causing severe crop damage and was recalled from the market in March 1991, which lead to mass tort litigation by farmers against DuPont. The partners in the firm were Paul D. Friedman, Diane D. Ferraro, Roland R. St. Louis, and Francisco R. Rodriguez. The Florida Bar brought separate disciplinary actions against the four named partners of the firm alleging that they committed misconduct by engaging in a secret "engagement agreement" with the DuPont Corporation, solely for their own financial benefit, while they were representing the clients in the Benlate cases against DuPont. Based on the partners' separate acts of misconduct, they received different sanctions.
Ferraro received a public reprimand and made restitution of $425,000 to the clients. Fla. Bar v. Ferraro, 839 So.2d 700 (Fla. 2003) (table citation). The sanction was based on the referee's finding that Ferraro had "absolutely nothing to do with the settlement negotiations with DuPont" and did not even know about the engagement agreement until well after her former partners received the prohibited funds. Due to these facts, the referee ultimately recommended a public reprimand.
Friedman did not know about the engagement agreement until after it had been executed. Thus, he had a comparatively small role in the firm's misconduct. Also, Friedman cooperated with the Bar and he paid restitution before his disciplinary case was reviewed by this Court. However, Friedman partook in the financial benefits of the unethical engagement agreement, exposed the Benlate clients to potential harm by engaging in the conflict of interest, and acquiesced in the firm lying to the clients. Friedman's misconduct merited a ninety-day, suspension and payment of restitution in the amount of $910,000. Fla. Bar v. Friedman, 940 So.2d 428 (Fla.2006) (table citation).
St. Louis and Rodriguez were the firm's principal actors in developing and executing the engagement agreement. They created a conflict of interest when they executed the engagement agreement with DuPont, placing their financial interests above those of their Benlate clients. See Fla. Bar v. Rodriguez, 959 So.2d 150 (Fla. 2007) (imposing a two-year suspension on *112 Rodriguez). As discussed herein, St. Louis engaged in additional misconduct, including acts of dishonesty such as lying to a judge and the Bar regarding the secret engagement agreement. Clearly, St. Louis's cumulative misconduct is the most egregious.

FACTS
With regard to St. Louis, a referee issued a report making the following findings and recommendations.
St. Louis and Rodriguez were the firm's primary lawyers working on the Benlate matters. St. Louis, who had been practicing law for approximately fourteen years, brought the Benlate clients to FRF & S. He had primary authority for communicating with the clients, and he was the main strategist in the case.
The Engagement Agreement Between the Firm and DuPont.[1] In 1994, Jim Davis, the owner of Davis Tree Farm (Davis), came to St. Louis, who agreed to take over Davis's Benlate case from a previous firm that had quit the case. If the Davis case went to trial, it had fair prospects of a recovery, although the liability, causation, and damages elements of Benlate cases can be difficult to prove. Davis's previous lawyer advised Davis that he thought the most DuPont would offer in settlement would be $200,000.
Over the next two years, St. Louis and FRF & S were representing nineteen additional Benlate claimants. DuPont vigorously defended itself with carefully calculated strategies and "scorched earth" discovery tactics. St. Louis aggressively pursued discovery, motion practice, and investigations. He documented a pattern and practice of DuPont's deliberate discovery abuse. By "diligent and extraordinary" efforts, St. Louis discovered a secret Benlate field test DuPont conducted in 1992 in Costa Rica, in which Benlate had severely damaged the plants. He proved that DuPont had concealed or destroyed all of the physical evidence of that test, and that DuPont had denied under oath that the test even took place. St. Louis parlayed that evidence, together with other DuPont discovery violations, into a 110-page motion for sanctions, asking the trial judge to strike DuPont's pleadings in the Davis case. The judge agreed, and orally advised the parties that she was striking DuPont's pleadings as a sanction. The judge encouraged DuPont to settle the case.
As a result of the judge's anticipated written order, DuPont actively sought to settle all twenty cases. During the settlement discussions, Rodriguez learned that DuPont was requesting the firm to cease representing any Benlate plaintiffs as a condition of the settlement. At various points in the negotiations, DuPont raised the issue of the firm not bringing any future Benlate cases. Initially, St. Louis refused to discuss such an "engagement agreement." Nevertheless, the firm researched the issue with regard to rule 4-5.6(b) of the Rules Regulating the Florida Bar.[2] The rule provides that a lawyer shall *113 not participate in offering or making "an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy."
DuPont made substantial offers for all the cases except Davis's. The amounts exceeded what the clients could have reasonably expected to recover if their cases went to trial. However, these nineteen Benlate clients had only marginal claims unless their cases were tied to the Davis case. Thus, because the Davis case was still unsettled, the parties agreed to submit the case to mediation. The parties employed a mediator, who was the special master for Benlate cases in Dade County.
During a recess in mediation, the trial judge entered a written order striking DuPont's pleadings in the Davis case. This had the effect of vitiating all of the irrevocable settlement offers made by DuPont over the prior month of negotiations. To salvage the situation, both parties contacted the mediator to secure an emergency hearing before the trial judge for 8:30 the next morning. Thereafter, the mediation evolved into a settlement negotiation of the Davis case. That evening, the negotiations resulted in a $30 million settlement for the Davis case. DuPont's offers were irrevocable for sixty days with the following contingencies: (1) the trial judge's order striking DuPont's pleadings would be vacated and sealed without any publicity; (2) all offers to all plaintiffs were contingent on actual settlement of the Davis case and another case brought by Fred Haupt; and (3) the settlement figures were to be kept confidential. The confidentiality of the settlement offers made to each client was ensured by a "hold back" provision that retained ten percent of the clients' settlement funds in escrow for two years. Those funds would be forfeited to DuPont if there were a breach of confidentiality.
After the settlement numbers were agreed upon in negotiation, the mediator reported to FRF & S that DuPont's counsel insisted that the firm agree not to bring any future Benlate cases against DuPont. St. Louis and Rodriguez initially rejected this condition, but DuPont's counsel insisted on the engagement agreement, asserting that it was DuPont's policy to secure such an agreement. The referee noted that the main proponents of the scheme were the attorneys for DuPont. In fact, DuPont's counsel referred to an article purportedly written for an American Bar Association publication that allegedly supported their position. The article allegedly described a practice where opposing attorneys are retained by the defendant, which would supposedly prevent the plaintiff's attorney from suing the defendant in the future. St Louis testified that FRF & S asked the mediator whether agreements like this were done and that the mediator responded in the affirmative. Ultimately, St. Louis and Rodriguez agreed to DuPont's conditions. St Louis went with DuPont's counsel to draft the engagement agreement and finalize the settlement agreement.
The engagement agreement stated that the firm accepted DuPont's offer to be retained for $6,445,000 and to perform unspecified work concerning Benlate matters. The engagement agreement provided that the work for DuPont was to commence "upon completion of all activities on behalf of our existing Benlate clients." Based on that provision, the referee found that St. Louis did not become an agent of DuPont, had no conflict of interest with his clients or DuPont, and did not violate rule 4-1.7(a) (representing adverse interests) of the Rules Regulating the Florida Bar. The referee found that St. Louis had violated rule 4-1.7(b) (duty to avoid limitation on independent professional judgment) because the exercise of his independent professional *114 judgment was limited by his own interest in keeping the engagement agreement a secret from his clients.
FRF & S received the $6,445,000 from DuPont for the engagement agreement. Although DuPont and FRF & S agreed that payments for work in the future were to be based on the FRF & S standard hourly rate, at no time did St. Louis or DuPont's counsel expect the firm to actually represent DuPont. The true purpose of the engagement agreement was to create the appearance of a conflict so FRF & S might circumvent Rule Regulating the Florida Bar 4-5.6(b).
St. Louis testified that, in his estimate, the value of potential future Benlate business that FRF & S surrendered to DuPont far exceeded $6.4 million. However, he claimed that if the firm had not agreed to DuPont's demand regarding the engagement agreement, the value of nineteen of the Benlate claims (other than the Davis claim) would have been greatly diminished. Thus, before the referee, St. Louis asserted that he was acting in the best interests of his clients when he signed the engagement agreement for $6,445,000. Nevertheless, the unrefuted evidence shows that the $59,000,000 paid to the clients and the $6,445,000 paid to FRF & S for the engagement agreement were separate funds. The $6,445,000 was not taken from funds that were available to the clients.
St. Louis and the DuPont attorneys finished drafting the engagement and settlement agreements in the early morning hours. St. Louis signed the engagement agreement and the settlement agreement on behalf of FRF & S. At the time, St. Louis was aware that rule 4-5.6(b) (a lawyer shall not participate in making an agreement in which a restriction on the lawyer's right to practice is part of the settlement) prohibited the making of such an agreement. The referee found that by entering into this agreement, St. Louis violated rule 4-5.6(b). In turn, St. Louis also violated rule 4-8.4(a) (a lawyer shall not violate the Rules of Professional Conduct) of the Rules Regulating the Florida Bar.
At 8:30 a.m., the parties appeared before the trial judge and announced that a settlement had been reached. FRF & S and DuPont did not disclose any of the details to the judge.
Aftermath of the Settlement and Engagement Agreements. After the settlement, St. Louis traveled around the state meeting with the Benlate clients, presenting the DuPont settlement offers. He urged them to accept the settlements. In fact, he informed some clients that if they did not accept, FRF & S would withdraw as their lawyers. St. Louis did not tell the nineteen clients about FRF & S's engagement agreement with DuPont or that FRF & S was now retained by DuPont. Further, each client received a redacted copy of the settlement agreement containing only his own settlement offer and an authorization to settle form.
Eventually, every client ended up authorizing the settlement, although some clients were dissatisfied and demanded more information. One client, Jerry Gilley, demanded to know the specifics of the settlement negotiations. St. Louis refused to tell Gilley anything other than the dollar amount he would receive. In addition, St. Louis refused to advise Gilley. Thus, Gilley was compelled to hire another attorney, Marc P. Ossinsky, to uncover the details of the settlement negotiations. St. Louis refused to provide Ossinsky or Gilley any information regarding the engagement agreement. By his behavior, St. Louis failed to keep his clients reasonably informed about the status of the engagement agreement and therefore violated rule 4-1.4(a) (informing client of status of *115 representation) of the Rules Regulating the Florida Bar. Further, St. Louis failed to explain the terms of the settlement to the extent reasonably necessary for his clients to make informed decisions regarding the representation and the offer from DuPont, even though there were specific inquiries regarding the terms of the settlement agreement. Thus, St. Louis also violated rule 4-1.4(b) (duty to explain matters to client).
By purposefully not disclosing the engagement agreement, St. Louis was protecting FRF & S's interest in the $6,445,000, his own interest in his share of that fee ($2,277,663), and DuPont's economic interests by not having it publicly disclosed that it had paid a law firm in violation of rule 4-5.6(b). Such information could have caused DuPont serious financial and legal harm because it had ongoing Benlate litigation across the country. Thus, the referee found St. Louis's exercise of his independent professional judgment was materially limited by his own financial interest. Therefore, he violated rule 4-1.7(b) (duty to avoid limitation on independent professional judgment) of the Rules Regulating the Florida Bar.
Except for Davis Tree Farms, none of the clients were told of the engagement agreement. St. Louis knew that the clients had not been told, did not tell them himself, and never explained the terms of the engagement agreement to any of his clients. Thus, he failed to keep his clients reasonably informed about the status of the engagement agreement and, therefore, violated rule 4-1.4(a).
Thereafter, St. Louis accepted his share of the $6,445,000 engagement agreement, which was $2,277,663. By accepting those proceeds, St. Louis ratified the terms of the engagement agreement. Also, St. Louis participated fully in all of the discussions and negotiations with DuPont concerning the engagement agreement. Thus, in executing the engagement agreement and keeping it secret from his clients, on behalf of the firm, St. Louis also violated rule 4-5.1(c) (a lawyer is responsible for another lawyer's violations of the Rules of Professional Conduct under certain circumstances) of the Rules Regulating the Florida Bar.
The referee also found that the $6,445,000 engagement agreement payment was in violation of rule 4-5.6(b) and, therefore, was a prohibited fee. Thus, St. Louis also violated rule 4-1.5(a) (an attorney shall not enter into an agreement for, charge, or collect an illegal, prohibited, or clearly excessive fee or cost) of the Rules Regulating the Florida Bar.
1997 Bar Investigation. In 1997, having received informal complaints, the Bar conducted an investigation into allegations that the $59,000,000 settlement agreement was not explained to the clients and that it was a prohibited aggregate settlement.
In January 1997, St. Louis sent a letter to Bar Counsel Elena Evans, which served as his response to the complaints. In that response, he made the following statement: "It is therefore disappointing that Mr. Ossinsky would continue to insist that we have withheld some kind of `documentation' relating to the settlement negotiations; we simply cannot furnish him with what does not exist." This statement was false because the engagement agreement did exist, and it had not been disclosed to Ossinsky or the Bar. At the time St. Louis made the statement, he knew his statement was false. It was a misrepresentation that was material to the Bar's investigation. Thus, St. Louis violated rules 4-8.1(a) and 4-8.4(c) (engaging in conduct involving misrepresentation) of the Rules Regulating the Florida Bar.
*116 The Bar received additional complaints from several former Benlate clients. The Bar's counsel for these investigations was Joan Fowler, and the Grievance Committee member was Jeanette Haag. At the request of St. Louis and Rodriguez, a meeting was arranged with these Bar representatives in Inverness. Prior to the meeting, Fowler had telephone conversations with St. Louis and Rodriguez in which she asked them to bring all documents relating to the settlements to the Inverness meeting. The meeting was held in Haag's office, with Haag, Fowler, St. Louis, Rodriguez, and Robert Batsel, the attorney representing St. Louis and Rodriguez, present.
Batsel advised St. Louis that he had a duty to answer all of the Bar's questions fully and truthfully, and to supply all documents that were responsive to an inquiry by the Bar. However, Batsel also advised St. Louis that he was not required to volunteer the existence of the engagement agreement or the confidential terms of the settlement.
Pursuant to the Bar's direction that St. Louis and Rodriguez bring any documents they wanted the Bar to review, they brought a box of records to the Inverness meeting. Although the records of the settlement and the engagement agreement were in the box, the engagement agreement was neither inspected by the Bar nor brought to the Bar's attention. There are two versions of what transpired at this meeting. St. Louis and Rodriguez contend that no question was asked that would require them to show the engagement agreement to the Bar. In contrast, Fowler testified that St. Louis and Rodriguez pulled documents out of the box one at a time, showed them to the Bar representatives, and explained each document. Fowler testified that she believed she had seen all of the documents in the box. Thus, she was under a misapprehension that she had seen all of the documents. St. Louis never revealed the existence of the engagement agreement to Fowler or Haag, even when Fowler asked Rodriguez and St. Louis if they had received money from DuPont. This issue was discussed in the context of $245,000 that appeared to have been paid directly to the firm by DuPont. The Bar's concern was whether this was a payoff for an agreement not to represent future Benlate plaintiffs against DuPont. Thus, at that time, Fowler was under the misapprehension that the $245,000 was the payment by DuPont to FRF & S for a restriction on the right to practice. When Fowler inquired about that money, St. Louis stated that the amount was an award of sanctions against DuPont on the Davis case. Fowler believed this was a complete answer. However, at this point St. Louis knew or should have known of Fowler's misapprehension, yet St. Louis failed to correct it. Nor did St. Louis disclose the existence of the engagement agreement.
The referee found St. Louis's purposeful omission created a misunderstanding for Fowler. St. Louis's conduct, from the start, was designed to gain Fowler's trust by his offer of complete cooperation with the investigation, his willingness to travel to Inverness, and his eagerness to meet face to face to explain his position. Yet, while St. Louis knew the engagement agreement was relevant to the investigation of the settlements of the clients' claims, he deliberately obfuscated matters and omitted showing the engagement agreement to Fowler. Thus, St. Louis violated rule 4-8.1(b) (a lawyer in connection with a disciplinary matter shall not fail to disclose a fact necessary to correct a misapprehension) of the Rules Regulating the Florida Bar. Because St. Louis had requested the meeting to explain his position and demonstrate the good work he *117 had performed for his clients, he had a duty to volunteer the engagement agreement to Fowler, especially because he knew at the time that he had created the misunderstanding. Yet, St. Louis purposefully failed to correct the misunderstanding. Thus, he violated rule 4-8.1(b) by his omission, and rule 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) by engaging in this misrepresentation to the Bar investigators.
Misrepresentation to Judge Wilson. In October 2000, St. Louis appeared before Circuit Judge Thomas S. Wilson, Jr., while representing Carolyn W. Smith in a malpractice action against her former lawyers, who had represented Smith in a Benlate claim against DuPont. Defendant's counsel moved to disqualify St. Louis because of a conflict of interest. Even though St. Louis knew that the engagement agreement with DuPont was material to the conflict of interest issue, he failed to disclose its existence to the circuit judge.
Judge Wilson later discovered the existence of the engagement agreement and a prior disciplinary consent judgment regarding the settlement. He asked St. Louis why he should not provide that information to the Bar. In response, St. Louis claimed: "I disclosed to The Florida Bar at the time I was questioned every piece of information, every document at my disposal." The referee found this statement to be false because the engagement agreement had not been disclosed to the Bar. Further, at the time St. Louis made this statement to Judge Wilson, St. Louis knew it was false. He also knew that it concerned a fact that was material to the inquiry of Judge Wilson regarding a possible conflict of interest in the malpractice case.
Judge Wilson asked St. Louis if he did not have the $6,445,000 agreement at his disposal, did not know about it, or whether it did not exist. St. Louis replied: "No, Your Honor, I'm not telling you that. I am telling you, sitting as the Court presiding over this case, that I made full disclosure to The Florida Bar." This statement was false because St. Louis had not disclosed the engagement agreement to the Bar. Further, St. Louis knew that the statement was false when he made the statement to Judge Wilson. The referee found that St. Louis's statements to Judge Wilson were misrepresentations that violated rules 4-3.3 (candor toward the tribunal) and 4-8.4(c) of the Rules Regulating the Florida Bar.
Defenses Raised by Respondent. Before the referee, St. Louis raised three affirmative defenses (1) the constitutionality of rule 4-5.6(b); (2) he acted under duress, coercion, and necessity; and (3) he acted on the advice of counsel.
The referee found that rule 4-5.6(b), the practice restriction rule, is constitutional on its face and as applied. The referee also found that the policy reasons for the rule directly apply to this case. When DuPont issued its ultimatum that the firm be retained, DuPont effectively made St. Louis, who the referee stated was among the most qualified Benlate plaintiffs' lawyers in the world, unavailable to future claimants.
Next, the referee found that duress, coercion, and necessity were not viable defenses to the rule violations under the facts of this case. As a matter of law, fear of not receiving money cannot be the basis for a claim of duress. Also, St. Louis's argument that the settlement had to be finalized on the night in question does not amount to coercion. St. Louis further testified that he was acting in his clients' best interests by entering into the engagement agreement. As a matter of law, that is not a defense to rule violations.
*118 Lastly, St. Louis raised advice of counsel as a defense to some of the alleged rule violations. Rule 4-5.2(a) of the Rules Regulating the Florida Bar states that a lawyer is bound by the rules of professional conduct even if the lawyer is instructed otherwise by another person. Thus, a defense based on advice of counsel is not available to respondents in Florida Bar discipline cases unless specifically provided for in a rule or considered as a matter in mitigation.[3]
Findings as to Guilt. The referee found St. Louis guilty of violating Rules Regulating the Florida Bar 4-1.4(a) (informing client of status of representation); 4-1.4(b) (duty to explain matters to client); 4-1.5(a) (prohibited fees); 4-1.7(b) (duty to avoid limitation on independent professional judgment); 4-3.3 (candor toward a tribunal); 4-5.1(c) (responsibilities of a partner); 4-5.6(b) (restriction on right to practice); 4-8.1(a) (knowingly making a false statement of material fact); 4-8.1(b) (failure to disclose a fact necessary to correct a misapprehension); 4-8.4(a) (violating or attempting to violate the rules of professional conduct); and 4-8.4(c) (engaging in conduct involving misrepresentation).
Disciplinary Recommendations. With regard to aggravating factors, the referee found that St. Louis (1) had a dishonest motive; (2) submitted false statements during the disciplinary process; and (3) had substantial experience in the practice of law based on his fourteen years of experience as a lawyer when he entered into the practice restriction. However, the referee noted that St. Louis had no substantial experience in mass tort litigation.
With regard to mitigating factors, the referee found that St. Louis (1) had no prior disciplinary record; (2) was inexperienced in the practice of mass tort litigation; (3) had good character or reputation; and (4) has shown remorse for violating the rules and for what this has done to his family. The referee further noted that St. Louis has been through a significant amount of turmoil and that he and his family have been financially damaged by this experience.
As to discipline, the referee recommended that St. Louis (1) be suspended from the practice of law for sixty days; (2) be placed on probation for three years during which time he would be required to perform one hundred hours of pro bono services per year and to take five additional ethics hours per year; and (3) forfeit $2,277,663 to The Florida Bar's Clients' Security Fund in accordance with rule 3-5.1(h) of the Rules Regulating the Florida Bar. The referee found that such a forfeiture is authorized and that it is not a fine. The referee also awarded costs to the Bar in the amount of $72,218.37.
On Review. Before this Court, the Bar filed an initial brief seeking disbarment and review of the referee's finding that St. Louis did not violate rule 4-1.7(a). St. Louis filed an amended answer brief and initial brief on cross appeal, in which he raised numerous issues.

ANALYSIS
1998 Consent Judgment and Res Judicata. St. Louis argues that the Bar's claims are barred by the doctrine of res judicata. In 1998, St. Louis and the Bar entered into a consent judgment regarding *119 disciplinary proceedings against St. Louis based on his misconduct in dealing with the firm's twenty Benlate clients. St. Louis asserts that the instant case is a subsequent attempt by the Bar to discipline him for conduct relating to the Benlate clients and that the doctrine of res judicata applies to this proceeding.
We disagree. The Bar was not precluded from bringing a second complaint that is based on the firm's secret agreement with DuPont. The doctrine of res judicata applies when all four of the following conditions are present: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of persons and parties to the action; and (4) "identity of quality in persons for or against whom claim is made." McGregor v. Provident Trust Co. of Philadelphia, 119 Fla. 718, 162 So. 323, 328 (1935); see also Palm AFC Holdings, Inc. v. Palm Beach County, 807 So.2d 703, 704 (Fla. 4th DCA 2002). Thus, the causes of action must be closely related for the doctrine of res judicata to apply. See Hay v. Salisbury, 92 Fla. 446, 109 So. 617, 621 (1926).
With regard to St. Louis, the previous and current proceedings broadly stem from his representation of the Benlate clients in a lawsuit against DuPont. However, the previous case focused on how FRF & S dealt with its clients and whether the firm improperly negotiated an aggregate settlement for the clients. In contrast, the current case is based on the secret engagement agreement that FRF & S arranged directly with DuPont while still representing its Benlate clients. Where "the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." Gray v. Gray, 91 Fla. 103, 107 So. 261, 262 (1926) (quoting Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1876)). Thus, the current case is not barred by res judicata as it is based on a different cause of action, i.e., St. Louis's relationship with DuPont. See Fla. Bar v. Gentry, 447 So.2d 1342 (Fla. 1984) (holding that because subsequent Bar allegations were based on separate, additional, and continuing misconduct, there was no identity of facts for res judicata to bar the proceedings).
Findings of Fact. St. Louis challenges the referee's findings of fact. He contends the referee's finding that he made a material misrepresentation when responding to Bar Counsel Evans's initial inquiry letter is not supported by the record. A referee's finding of fact carries with it a presumption of correctness that should be upheld unless clearly erroneous or without support in the record. Fla. Bar v. Barrett, 897 So.2d 1269, 1275 (Fla.2005). Absent a showing that the referee's findings are clearly erroneous or lacking in evidentiary support, this Court is precluded from reweighing the evidence and substituting its judgment for that of the referee. Id.
In January 1997, St. Louis sent the response letter to Bar Counsel Evans, in which he stated: "It is therefore disappointing that Mr. Ossinsky would continue to insist that we have withheld some kind of `documentation' relating to the settlement negotiations; we simply cannot furnish him with what does not exist." When St. Louis wrote that response, he knew that the engagement agreement existed because he had assisted in drafting it. Further, he knew that it had not been disclosed to Gilley, Ossinsky, or the Bar. Thus, it is clear St. Louis lied to the Bar when he claimed that he was not withholding any documents and that no other documents existed. The referee's factual findings *120 on this point are supported by the record.
Next, St. Louis claims the referee's finding that St. Louis failed to correct the apparent misapprehension of Bar investigators at the Inverness meeting is also not supported by the record. He argues that he did not lie to the investigators. In contrast to St. Louis's assertions, however, the record supports the referee's finding. St. Louis admitted that he did not want to divulge the engagement agreement to the Bar. In fact, he purposefully avoided disclosing the engagement agreement to the Bar investigators. Based on St. Louis's handling of the documents that were brought to the meeting and displayed by St. Louis to the Bar investigators, Fowler was under a misapprehension that she had seen all of the documents in the box.
Rule 4-8.1 of the Rules Regulating the Florida Bar provides that a lawyer, in connection with a disciplinary matter, shall not "fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter or knowingly fail to respond to a lawful demand for information" from a bar admissions or bar disciplinary authority. The rule may be violated by an omission in connection with a disciplinary investigation of the lawyer's own conduct. Thus, rule 4-8.1 imposes an affirmative duty upon lawyers to abide by high standards of truthfulness and candor in order to maintain the integrity of the profession. We conclude that the record and the rule support the referee's findings in this case.
St. Louis also challenges the referee's finding that he made deliberate misrepresentations of material facts to Judge Wilson. St. Louis asserts that he merely "misspoke" when telling Judge Wilson that he had engaged in "full disclosure" with the Bar. We strongly disagree with St. Louis's characterization of his statements and conclude that the record supports the referee's findings. Judge Wilson questioned St. Louis because of an allegation that St. Louis had a conflict of interest that could result in disqualification. Obviously, at that time, St. Louis knew that he had previously signed the engagement agreement with DuPont, which would create a conflict of interest for St. Louis regarding Benlate cases. The record clearly demonstrates that St. Louis did not answer Judge Wilson with candor and truthfulness. Thus, the referee's findings are amply supported.
Violation of Rule 4-1.7(a). The Bar argues that the referee was clearly erroneous in failing to find that St. Louis violated rule 4-1.7(a) (representing interests adverse to his clients). We agree. The referee's determination that St. Louis was not guilty of violating rule 4-1.7(a) was a legal conclusion. This Court's scope of review in attorney disciplinary actions is broader for legal conclusions than it is for factual findings. See Fla. Bar v. Joy, 679 So.2d 1165 (Fla.1996). Rule 4-1.7(a) provides that a lawyer shall not represent a client if representation of that client will be directly adverse to the interests of another client unless (1) the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client; and (2) each client consents after consultation. The rule imposes a mandatory prohibition on such representation, unless the lawyer meets the two-step exception. St. Louis did not meet those steps.
With regard to the first step, St. Louis knowingly entered into the engagement agreement with DuPont, forming a lawyer-client relationship with DuPont while still representing the Benlate clients. The record reveals that St. Louis even pressured some of his Benlate clients to accept DuPont's *121 settlement offer. He informed clients that he would cease representing them unless they accepted the settlement, although he refused to inform those clients of the settlement details. In addition, St. Louis decided not to inform his clients about his decision to represent DuPont, the very decision he made while negotiating their cases against DuPont. Thus, the record demonstrates that through his actions St. Louis had divided loyalties, and that his divided loyalties could have adversely affected his Benlate clients. As to the second step, the record also demonstrates that St. Louis did not consult with or receive the consent of the Benlate clients before he entered into the engagement agreement. In fact, St. Louis went to great efforts to keep the engagement agreement secret from his Benlate clients.
St. Louis continued to advise his Benlate clients after he signed the secret engagement agreement with DuPont. He actually represented the Benlate plaintiffs for two years after signing the engagement agreement by acting as the escrow agent who administered the ten percent holdback monies. Thus, St. Louis was representing adverse interests because he was on retainer to DuPont during that period. Accordingly, we disapprove the referee's finding. We conclude that St. Louis violated rule 4-1.7(a) through his actions.
Constitutionality of Rule 4-5.6(b). St. Louis asserts that rule 4-5.6(b) (restriction on practice) is unconstitutional. He broadly claims that the rule lacks a reasonable relation to a legitimate purpose and represents the taking of a lawyer's liberty or property rights without due process and adequate compensation. Rule 4-5.6(b) states that a "lawyer shall not participate in offering or making . . . an agreement in which a restriction on the lawyer's right to practice is part of the settlement of a client controversy." The constitutionality of rule 4-5.6(b) is determined by applying the rational basis test. See generally DeBock v. State, 512 So.2d 164, 168 (Fla.1987) (stating that there is a "rational basis" for holding attorneys to different standards than other regulated professionals); In re Fla. Bar Amendment to Code of Prof'l Responsibility (Contingent Fees), 349 So.2d 630, 635 (Fla.1977) (applying rational basis test in analyzing proposed amendment that impinged upon constitutional guarantee of freedom of contract). The rational basis test is two-pronged: (1) whether there is a legitimate state interest to be served; and, if so, (2) whether the rule bears some reasonable relationship to that legitimate state interest. See Amerisure Ins. Co. v. State Farm Mutual Auto. Ins. Co., 897 So.2d 1287, 1290 (Fla.2005).
St. Louis incorrectly claims that rule 4-5.6(b) does not bear a rational relationship to a legitimate state purpose. Clearly, the legitimate state purpose is to promote public welfare and the public's trust and confidence in the legal process, thus satisfying the first prong of the rational basis test. The second prong is satisfied because rule 4-5.6(b) promotes public welfare by prohibiting lawyers from entering in engagement agreements and thereby ensuring that (1) the public has access to qualified attorneys; (2) clients' awards are based on the merits of their claims; and (3) no conflicts exist between the interests of present and future clients. See ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 371 (1993). Thus, rule 4-5.6(b) does not wantonly or arbitrarily interfere in the private rights of individuals.
St. Louis also asserts that rule 4-5.6(b) infringes on his liberty and property rights inherent in his freedom to contract and practice law. He overlooks the crucial point that the practice of law is not a right, but a conditional and revocable privilege. *122 See DeBock, 512 So.2d at 168. Moreover, the freedom to contract may be duly limited in the interest of public welfare. In re Fla. Bar Amendment, 349 So.2d at 634 (stating that the freedom to contract is not an absolute right, but a qualified right and therefore subject to a reasonable restraint in the interest of public welfare). Thus, the rule regulates the privilege to practice law for the public's best interests. Accordingly, we conclude that the rule passes the rational basis test and is constitutional.
Rule of Lenity and Bar Proceedings. St. Louis claims that the referee erroneously rejected the "rule of lenity" when he examined the allegations of rule violations and the fee forfeiture issue. He claims that the rules regarding the forfeiture of fees are ambiguous and, therefore, the rules should be construed in favor of the accused, i.e., St. Louis should not be subject to this sanction. We disagree. Typically, the rule of lenity, as codified in section 775.021, Florida Statutes (2006), only applies in the criminal context. See, e.g., Jones v. State, 728 So.2d 788 (Fla. 1st DCA 1999). The rule is applicable where the language of a criminal statute is susceptible to differing interpretations, thus allowing for construction in favor of the accused. Id. § 775.021(1). Further, section 775.021(3) provides that "[t]his section does not affect the power of a court to punish for contempt or to employ any sanction authorized by law for the enforcement of an order or a civil judgment or decree." (Emphasis added.) Bar disciplinary proceedings, as in the instant case, are not considered civil or criminal, but are quasi-judicial. See Fla. Bar v. Rotstein, 835 So.2d 241, 243 (Fla.2002). Thus, the rule of lenity does not apply to bar proceedings, where this Court has the inherent power to employ any lawfully authorized sanction to discipline Florida attorneys. Accordingly, we approve the referee's finding that the rule of lenity does not apply to this case.
Asserted Defenses. St. Louis claims that the referee erred in finding that the defenses of duress, necessity, and coercion are inapplicable in this case. He contends that the referee's legal conclusion that "fear of not receiving money cannot be a basis for a claim of duress" is erroneous. Further, St. Louis reasons that he was in a difficult position when DuPont insisted that the engagement agreement was necessary to settle the cases.
The defenses of duress, necessity, and coercion are rarely presented in bar proceedings. In Florida Bar v. Wishart, 543 So.2d 1250, 1251 (Fla.1989), we approved the referee's rejection of the necessity defense when Wishart, a lawyer and step-grandfather, sought custody of his step-granddaughter and in the process disobeyed court orders and claimed a necessity defense to protect his step-granddaughter from harm. Similarly, in this case, the referee ruled that duress, coercion, and necessity are not viable defenses to St. Louis's rule violations under these facts. There is no authority to support St. Louis's claims, but there is authority for the referee's finding. See Wishart. Accordingly, we conclude that the referee properly found that the defenses of duress, necessity, and coercion are inapplicable in this case.
Disciplinary Sanction. The Bar argues that the referee's recommended disciplinary sanction of suspension is not supported and that disbarment is the appropriate sanction. We agree. St. Louis engaged in several acts of dishonesty. He violated rules 4-3.3 and 4-8.4(c) when he made false statements to Judge Wilson. This Court typically imposes the severe sanction of disbarment on lawyers who intentionally lie to a court. An officer *123 of the court who knowingly seeks to corrupt the legal process can expect to be excluded from that process. See Fla. Bar v. Kickliter, 559 So.2d 1123 (Fla.1990) (disbarring attorney who committed a fraud on the court); Fla. Bar v. Agar, 394 So.2d 405 (Fla.1980) (disbarring attorney who solicited false testimony, thereby allowing his client to perpetrate a fraud on the court).
In addition, St. Louis engaged in further violations of rule 4-8.4(c) when he made a false representation and committed an omission to two Florida Bar representatives. Further, he deliberately did not tell his clients about the engagement agreement. Thus, it is clear that St. Louis engaged in an extensive pattern of intentional deceit.
Disbarment is appropriate "when a lawyer intentionally engages in conduct that is a violation of a duty owed as a professional with the intent to obtain a benefit for the lawyer or another, and causes serious or potentially serious injury to a client, the public, or the legal system." Fla. Stds. Imposing Law. Sancs. 7.1. At the time St. Louis made the misrepresentations to Judge Wilson and the Bar representatives, he knew his statements were false. Also, he knowingly failed to inform his Benlate clients about the engagement agreement and the conflict of interest. He intentionally engaged in these misrepresentations, violating the duties he owed as a professional, in order to preserve his portion of the $6,445,000 engagement agreement. These acts of deceit were detrimental to the legal system, negatively impacting the proceedings before Judge Wilson and St. Louis's representation of his Benlate clients.
Further, when St. Louis entered into the engagement agreement, he violated rule 4-5.6(b) by restricting his right to practice. Attorneys who engage in such engagement agreements receive severe sanctions, even when the misconduct is far less egregious than that in the instant case. See In re Hager, 812 A.2d 904 (D.C.2002)(suspending for one year a lawyer who, while representing fifty clients in claims against a manufacturer, secured a side agreement with the manufacturer involving restricting his right to practice, dropping the pending case, and maintaining confidentiality about the side agreement); In re Brandt, 331 Or. 113, 10 P.3d 906 (2000)(imposing thirteen-month and twelve-month suspensions on two lawyers, one with a prior disciplinary record and the other without, for entering into a side agreement with the adversary to act as legal counsel). In light of the severe sanctions imposed on attorneys who have engaged in secret engagement agreements and St. Louis's extensive acts of deceit, we conclude that disbarment is the appropriate sanction.
Forfeiture of the Prohibited Fee. St. Louis challenges the referee's recommendation that he forfeit the funds he acquired through the engagement agreement. The funds for the engagement agreement were not a portion of the clients' settlement. The engagement agreement funds were from the separate agreement between FRF & S and DuPont. Thus, as the funds were never client funds, it would be improper to provide the funds to the clients as restitution.
The proceeds from the engagement agreement are a prohibited fee, which are addressed by rule 3-5.1(h). The rule provides, in pertinent part:
Forfeiture of Fees. An order of the Supreme Court of Florida or a report of minor misconduct adjudicating a respondent guilty of entering into, charging, or collecting a fee prohibited by the Rules Regulating The Florida Bar may order the respondent to forfeit the fee or any *124 part thereof. . . . [A] fee otherwise prohibited by the Rules Regulating The Florida Bar may be ordered forfeited to The Florida Bar Clients' Security Fund and disbursed in accordance with its rules and regulations.
Thus, pursuant to rule 3-5.1(h), the referee appropriately recommended forfeiture of the prohibited fees to the clients' security fund.
St. Louis disagrees with the referee's recommendation and relies on Florida Bar v. Frederick, 756 So.2d 79 (Fla.2000), to argue that fines are not permitted in disciplinary cases. St. Louis is correct that fines are not allowed. However, in the context of this case, his reliance on Frederick is misplaced and his argument is without merit. Frederick does not address the distinct concept of disgorgement of prohibited fees pursuant to rule 3-5.1(h).
Next, St. Louis argues that he should be permitted to retain the prohibited fee. We disagree. Allowing St. Louis to keep these funds would permit him to benefit from his own wrongdoing. Reimbursing DuPont would also be improper because DuPont has "unclean hands" and is partially responsible for the instant misconduct. The only remaining option is payment to the Florida Bar Clients' Security Fund, a fund that compensates clients who have been harmed by their lawyers.
Requiring St. Louis to disgorge his prohibited fee to the Clients' Security Fund is in accord with the three well-established principles that this Court has set for attorney discipline.
[S]anctions imposed for unethical conduct by members of the Bar must serve three purposes.
First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
Fla. Bar v. Thue, 244 So.2d 424, 425 (Fla. 1971) (quoting Fla. Bar v. Pahules, 233 So.2d 130, 132 (Fla.1970)). Permitting St. Louis to retain his ill-gotten gains would fail to provide a deterrent and could actually encourage misconduct by unethical lawyers, who would seize an opportunity to reap huge monetary rewards. Moreover, society would be harmed by allowing St. Louis to benefit in such a substantial way from his misconduct.
In In re Hager, 812 A.2d 904 (D.C.2002), the District of Columbia Court of Appeals examined a situation similar to the instant case. An attorney representing clients in a potential class action against a shampoo manufacturer entered into a settlement whereby clients would receive full purchase price refunds for the shampoo. The attorney was to be paid $225,000 in fees and expenses by the manufacturer, in return for agreeing not to represent present or future clients on similar claims against the manufacturer. Further, the attorney was not to disclose this agreement and the amount of his payment to the clients. Id. at 908. The court found that the attorney violated bar rules and it considered ordering him to disgorge his ill-gotten fees. The court speculated that restitution to the clients was inappropriate, but it was deeply concerned about the attorney's unjust enrichment. Id. at 922-23. Eventually, as part of his reinstatement proceedings, the attorney was required to place the improper *125 fees into a client security fund. See In re Hager, 878 A.2d 1246 (D.C.2005).
Based on the clear language of rule 3-5.1(h), the three purposes of attorney discipline, and Hager, we approve the referee's recommendation that St. Louis be required to disgorge the prohibited fee into the Clients' Security Fund. Further, after considering the referee's report, we modify the amount that the referee recommended for disgorgement. Footnote 18 of the referee's report sets out the computation for determining the amount of $2,277,663. We defer to the referee as the finder of fact on this figure. However, we note that the referee recommended that this total be reduced by the amount St. Louis paid in taxes. We disagree. St. Louis can seek a refund of those taxes from the Internal Revenue Service. Thus, we require St. Louis to disgorge the full amount of $2,277,663, plus interest. Interest shall be calculated as starting on August 12, 1996, the date the firm received the $6,445,000.

CONCLUSION
Accordingly, Roland Raymond St. Louis, Jr., is hereby disbarred. The disbarment will be effective thirty days from the filing of this opinion so that St. Louis can close out his practice and protect the interests of existing clients. If St. Louis notifies this Court in writing that he is no longer practicing and does not need the thirty days to protect existing clients, this Court will enter an order making the disbarment effective immediately. St. Louis shall accept no new business from the date this opinion is filed until he is readmitted to the practice of law in Florida. Further, St. Louis is required to disgorge $2,277,663, plus interest, to The Florida Bar Clients' Security Fund.
Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida XXXXX-XXXX, for recovery of costs from Roland Raymond St. Louis, Jr., in the amount of $72,218.37, for which sum let execution issue.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] The referee found that entering into this agreement violated rule 4-5.6(b) (restriction on the right to practice) of the Rules Regulating the Florida Bar and resulted in the acceptance of a prohibited fee in violation of rule 4-1.5(a) of the Rules Regulating the Florida Bar.
[2] In July 1996, Rodriguez asked an associate to research whether the firm could ethically agree to DuPont's condition that the firm not litigate against DuPont in the future. The associate researched the issue and reported to Rodriguez that the law was unclear, but he thought that DuPont's objective could be achieved by DuPont engaging the firm after the firm finished its representation of the twenty Benlate clients. This is the action the firm subsequently undertook.
[3] Similarly, other jurisdictions have held that the defense is not available in bar discipline proceedings. In People v. Katz, 58 P.3d 1176, 1187 (Colo.P.D.J.2002), that court said: "It is the individual attorney's duty and obligation to comply with the Rules of Professional Conduct. The attorney may not delegate that duty or responsibility to another under the umbrella of advice of counsel and thereby create a defense to a violation of those Rules."