# Supreme Court of Florida

_____

No. SC13-388
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**CHARLES JAY KANE,**
Respondent.
_____

No. SC13-389
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**HARLEY NATHAN KANE,**
Respondent.
_____

No. SC13-390
_____

**THE FLORIDA BAR,**
Complainant,

vs.

**DARIN JAMES LENTNER,**
Respondent.

[October 6, 2016]

PER CURIAM.

We have for review three referee's reports recommending that respondents Charles Jay Kane, Harley Nathan Kane, and Darin James Lentner be found guilty of professional misconduct in violation of the Rules Regulating the Florida Bar (Bar Rules), and sanctioned as follows: in case SC13-388, the referee recommends that Charles Kane be suspended from the practice of law for three years; in case SC13-389, the referee recommends that Harley Kane be disbarred; and in case SC13-390, the referee recommends that Darin Lentner be suspended for two years.[1] On June 14, 2016, we issued orders suspending each respondent until further order of the Court and consolidating the three cases. As discussed in this opinion, we now approve the referee's findings of fact and recommendations as to guilt in each case. We also approve the referee's recommendation that Harley Kane be disbarred. However, we disapprove the referee's recommended sanctions for Charles Kane and Darin Lentner. Given their egregious misconduct, we conclude that all three respondents should be disbarred from the practice of law in Florida.

## I. FACTS

_____

1. We have jurisdiction. See art. V, § 15, Fla. Const.

- 2 -

In March 2013, The Florida Bar filed complaints against Charles Kane, Harley Kane, and Darin Lentner, alleging that each engaged in misconduct in violation of the Bar Rules. The complaints were separately referred to a referee; one referee was appointed to hear all three cases. The referee conducted a joint hearing to address the alleged rules violations against all three respondents. Later, the referee held a hearing to address sanctions for respondents Charles Kane and Harley Kane, and a separate hearing to address sanctions for respondent Darin Lentner. The referee filed three separate reports for the Court's consideration.

The referee found that beginning in 2001, Charles Kane and Harley Kane, through their law firm Kane & Kane, Darin Lentner and Laura Watson of the firm Laura M. Watson, P.A., d/b/a Watson & Lentner (Watson & Lentner), and Gary Marks and Amir Fleischer of the firm Marks & Fleischer, P.A. (collectively, the PIP lawyers or PIP law firms), engaged in a joint effort to solicit healthcare provider clients with personal injury protection (PIP) claims against Progressive Insurance Company, among other insurance companies. The firms jointly held seminars and prepared marketing brochures and materials to disseminate to potential clients. While one of the PIP law firms was assigned the primary role in representing each of these healthcare provider clients, the "Special Co-Counsel Contingency Contract" provided that all three firms assumed joint legal responsibility for the clients.

In addition to the PIP claims, the PIP law firms, including both Kane & Kane and Watson & Lentner, decided to pursue a separate action against Progressive for its bad faith in systematically refusing to pay valid insurance claims. Each firm filed civil remedy notices with the Florida Department of Insurance on behalf of its clients. To handle the bad faith litigation, the PIP lawyers also brought in specialized counsel, attorneys Todd Stewart, Larry Stewart, and William Hearon (collectively, the bad faith attorneys). The two groups agreed to a contingency fee schedule, pursuant to which the attorneys would collectively take 40 percent of any recovery resulting from the bad faith litigation. Of that 40 percent, the bad faith attorneys would receive 60 percent and the PIP lawyers would take 40 percent. The PIP lawyers would receive 100 percent of any fees collected in the PIP cases.

The bad faith attorneys filed a lawsuit against Progressive for bad faith, known as "the Goldcoast case." The case would include thirty-seven named plaintiffs. These thirty-seven plaintiffs were clients of the Watson & Lentner and Marks & Fleischer firms; none of Kane & Kane's clients were named plaintiffs. Still, each of the PIP law firms and each of the bad faith attorneys executed a contract agreeing to jointly represent all thirty-seven plaintiffs.

Over the next two years, the bad faith attorneys continued to prosecute the Goldcoast case. Progressive vigorously defended the suit and refused to produce

- 4 -

certain internal documents, claiming privilege. The bad faith attorneys obtained key legal rulings compelling Progressive to produce the documents at issue, which opened the door to settlement negotiations. Indeed, in early 2004, Progressive indicated that it was interested in negotiations to settle the bad faith case. Although the parties have argued extensively as to this issue, the referee found, and we agree, that the PIP lawyers and the bad faith attorneys each were aware that these settlement talks would encompass the entire "universe" of bad faith claims, meaning the bad faith claims for all of their existing PIP clients against Progressive, not just the thirty-seven plaintiffs named in the Goldcoast case. In preparation for the negotiations, each of the PIP law firms, including both Kane & Kane and Watson & Lentner, provided the bad faith attorneys with lists of their PIP clients. The bad faith attorneys prepared a detailed chart setting out the number of clients and claims in the Goldcoast case, as well as the additional clients and bad faith claims not yet included in the case. The chart identified a total of 441 clients.

Progressive later indicated that it wanted to expand the settlement negotiations to include both the universe of bad faith claims and the clients' PIP benefits claims. The PIP lawyers authorized the bad faith attorneys to negotiate both sets of claims, and the parties scheduled a mediation for April 19, 2004. In advance of the mediation, Larry Stewart spoke with the PIP lawyers to discuss the

mediation and to modify the original fee schedule so that the bad faith attorneys would receive a larger percentage of any attorney fees collected in the bad faith case in the event they were able to settle the PIP claims.

The mediation was held on April 19, 2004, and was attended by Larry Stewart and William Hearon of the bad faith attorneys, and Darin Lentner of the PIP lawyers. During the discussions, the mediator suggested that Progressive had set aside $6 or $7 million to settle the bad faith claims; however, Progressive offered only $3.5 million. This offer was rejected.

When the mediation was unsuccessful, the bad faith attorneys continued their efforts to compel production in the Goldcoast case. The referee found that Progressive lost a "last ditch effort" to prevent production of its internal records, and the company was facing sanctions. One week before it was scheduled to comply with a production order, Progressive initiated settlement negotiations with the PIP lawyers. The bad faith attorneys were excluded from these negotiations. Progressive offered an undifferentiated lump sum to each of the three PIP law firms, together totaling $14.5 million, as settlement of all their clients' claims, both PIP and bad faith, as well as attorney fees. On Sunday, May 16, 2004, all six of the PIP lawyers, including Charles Kane, Harley Kane, and Darin Lentner, met with lawyers from Progressive to put the agreement in writing. Again, the bad faith attorneys were not told of Progressive's offers, and they were not asked to

attend the meeting on May 16. As a result of this meeting, the PIP lawyers signed a "Memorandum of Understanding" (MOU) settling all cases and claims, subject to client agreement. Pursuant to the MOU, the clients were required to release all claims against Progressive, including both PIP claims and bad faith claims. The MOU did not specify how the settlement funds would be allocated; rather, it was left to the PIP lawyers to divide the funds between the claims and the costs and fees. The only thing required to trigger payment was a requisite number of signed client releases: 100 percent of the named Goldcoast case plaintiffs and 80 percent of the remaining PIP clients of all three PIP firms. Also as a part of the MOU, the PIP lawyers agreed to defend, indemnify, and hold the Progressive entities harmless from any claims of their clients.

Several days later, the PIP lawyers, including Charles Kane, Harley Kane, and Darin Lentner, met with Larry Stewart and offered him $300,000 to compensate all three bad faith attorneys for their work on the bad faith case. The PIP lawyers refused to disclose the terms of the settlement with Progressive, saying only that the cases and claims had been settled. Stewart rejected the offer and told the PIP lawyers that he believed the settlement was improper because it did not allocate any funds to the bad faith claims. The bad faith attorneys then wrote a letter, sent to each of the named plaintiffs in the Goldcoast case, explaining their efforts to compel production of Progressive's internal documents and the April

2004 mediation. The letter asserted that as a result of the PIP lawyers' secret settlement with Progressive, the clients' bad faith claims may have been "compromised or even sacrificed." The bad faith attorneys sent a copy of their letter to each of the PIP law firms and asked the PIP lawyers to forward the letter to their clients who were not named in the Goldcoast case. The PIP lawyers did not forward the letter as requested. Instead, Charles Kane drafted a letter, titled "Notice of Disagreement Between Counsel" (disagreement letter), for the Watson & Lentner and Marks & Fleischer firms to send to clients who were named as plaintiffs in the Goldcoast case. The letter contained misleading statements regarding the bad faith attorneys and their efforts to pursue the bad faith claims on behalf of the clients.

After the meeting with Larry Stewart, Charles Kane became concerned that the undifferentiated settlement in the MOU did not allocate any money to the Goldcoast case, and he suggested further negotiations with Progressive. As a result, in June 2004, the PIP lawyers and Progressive entered an "Amendment to Memorandum of Understanding" (AMOU), allocating $1.75 million to settle the bad faith claims of the plaintiffs in the Goldcoast case. Still, no money was allocated for the potential bad faith claims for the remaining PIP clients (those not named as plaintiffs in the Goldcoast case). As in the original MOU, it was left to the PIP lawyers to determine how the remaining settlement funds would be

allocated to the clients and how much would be taken as attorney fees. All three PIP law firms, including both Kane & Kane and Watson & Lentner, decided that their PIP clients (those not named in the Goldcoast case) would only be paid the amount of PIP benefits owed to them by Progressive, plus interest; those clients did not receive any compensation for their bad faith claims, even though they were required to release the claims in the settlement. The PIP lawyers again agreed to defend Progressive against their clients and absolved Progressive of any responsibility for disbursement of the settlement funds.

Each of the PIP law firms was responsible for notifying its clients of the settlement and obtaining the releases necessary to trigger payment under the MOU and AMOU. At Kane & Kane, both Charles Kane and Harley Kane directed lawyers in the firm in their communications with clients; Harley Kane, in particular, reviewed and approved letters sent to the firm's clients. At Watson & Lentner, Lentner was responsible for communicating with clients regarding the settlement, and he testified that he personally called each client. Clients of both firms were not told of the conflicts of interest created in the MOU and AMOU, the total amount of the settlement, the amount that Kane & Kane or Watson & Lentner intended to take as attorney fees, or that some clients received money for their bad faith claims while others did not. The clients of both firms were also not provided closing statements.

Ultimately, the PIP lawyers were able to obtain the requisite number of releases necessary to trigger payments under the MOU and AMOU. Kane & Kane received $5.25 million. The firm paid $672,742 to its PIP clients, $433,202 in costs, and took $4,144,055 in attorney fees. Watson & Lentner received $3,075,000, and the firm paid $361,470 to its PIP clients, $190,736 in costs, and took $2,522,792 in attorney fees. Once the firms received the settlement money, the bad faith attorneys were discharged, and a notice of voluntary dismissal with prejudice was filed, ending the Goldcoast case.

Shortly after they were discharged, the bad faith attorneys sued the PIP lawyers and law firms, including Harley Kane, Charles Kane, and Kane & Kane, and Darin Lentner and Watson & Lentner, for quantum meruit and/or unjust enrichment, among other claims (the unjust enrichment case). In April 2008, after years of litigation, Judge David F. Crow entered a final judgment in favor of the bad faith attorneys on their quantum meruit and/or unjust enrichment claims. Stewart Tilghman Fox & Bianchi, P.A. v. Kane & Kane, No. 502004CA006138XXXXMBAO, 2008 WL 8833300 (Fla. 15th Cir. Ct. Apr. 24, 2008). The final judgment included extensive findings as to the PIP lawyers' actions, noting that the matter "could be a case study for a course on professional conduct involving multi-party joint representation agreements and the ethical pitfalls surrounding such agreements." Id. at *2. Specifically, the court found that

the PIP lawyers pursued the bad faith claims to increase pressure on Progressive to settle and that while only thirty-seven clients were actually named as plaintiffs in the Goldcoast case, both the PIP lawyers and the bad faith attorneys contemplated that additional plaintiffs would be added as the PIP lawyers continued to perfect the clients' bad faith claims. Judge Crow held:

> The bad faith claims were an important pressure point on Progressive, they represented the biggest damage threat, they were a driving force behind the settlement, and their release was one of the principal considerations for the settlement. . . .
>       . . . .
>       . . . . The [bad faith attorneys'] work resulted in favorable rulings which opened the door to settlement when [the PIP lawyers] had been unable to make any progress in that regard on their own. In addition, the evidence establishes that [the PIP] law firms unfairly deprived [the bad faith attorneys] of a fee by ignoring multiple conflicts of interest, misrepresenting the terms of the settlement to the [bad faith attorneys], misrepresenting the terms of the settlement to the clients to obtain the releases to trigger payment, manipulating the allocation of the settlement to obtain most of it as attorneys' fees, and by discharging the [bad faith attorneys] for no reason.

Id. at *18-19. The trial court entered judgment against Kane & Kane, Harley Kane, and Charles Kane, jointly and severally, in the amount of $2 million. It also entered judgment against "Laura M. Watson, P.A., d/b/a Watson & Lentner" in the amount of $981,792. The court did not enter judgment against Laura Watson or Darin Lentner individually, finding there to be no evidence that either was a party to any agreement with the bad faith attorneys and that there was no evidence

- 11 -

presented as to the value of fees individually conferred upon either. Judge Crow directed that his order be forwarded to the Bar for disciplinary action.

Based on these facts, the referee recommended that Charles Kane, Harley Kane, and Darin Lentner each be found guilty of violating the following 2004 Bar Rules: 4-1.7(b) (a lawyer shall not represent a client if the lawyer's exercise of independent professional judgment in the representation may be materially limited by the lawyer's responsibilities to another client or to a third person or by the lawyer's own interests unless the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client, and the client gives consent); 4-1.7(c) (in representing multiple clients in a single matter, the consultation shall include an explanation of the implications of the common representation and the advantages and risks involved); 4-1.8(g) (a lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, unless each client consents after consultation, including disclosure of the existence and nature of all the claims involved and of the participation of each person in the settlement); 4-1.4(b) (a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions); 4-8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation); 3-4.3 (the commission by a lawyer of any act that is unlawful or contrary to honesty and

justice may constitute cause for discipline); 4-1.5(f)(5) (in the event of recovery in a case involving a contingency fee, the lawyer shall prepare a closing statement).

In determining the appropriate discipline, the referee found seven aggravating factors applicable in each case: (1) respondents acted with a dishonest or selfish motive; (2) they engaged in a pattern of misconduct; (3) they committed multiple offenses; (4) they made false statements during the disciplinary proceedings; (5) they have refused to acknowledge the wrongful nature of their misconduct; (6) they have substantial experience in the practice of law; and (7) they have shown an indifference to making restitution. The referee also found two mitigating factors: respondents had no prior disciplinary record, and there was evidence of their good character and reputation.

As noted, the referee recommends that Charles Kane be suspended for three years, that Harley Kane be disbarred, and that Darin Lentner be suspended for two years. The referee also recommends the following payments as conditions of seeking reinstatement: Charles Kane and Harley Kane be ordered to satisfy the judgment entered against them in the unjust enrichment case and each pay $11,831.65 in costs to the Bar; Lentner be ordered to pay $856,789 to the Clients' Security Fund, as well as the Bar's costs, totaling $13,737.48. Charles Kane, Harley Kane, and Darin Lentner have each filed petitions for review.

## II. ANALYSIS

## A. Charles Kane and Harley Kane's Motion to Dismiss

In the proceedings before the referee, Charles Kane and Harley Kane filed a motion to dismiss, which alleged that the Bar and Larry Stewart engaged in misconduct in prosecuting the disciplinary cases against them. The referee denied the motion. The standard of review for a referee's ruling on a motion to dismiss is whether the referee abused his or her discretion. See Fla. Bar v. Head, 27 So. 3d 1, 6 (Fla. 2010). To the extent that the motion raises a question of law, the referee's decision is subject to de novo review. See Fla. Bar. v. D'Ambrosio, 25 So. 3d 1209, 1214 (Fla. 2009); Fla. Bar v. Greene, 926 So. 2d 1195, 1199 (Fla. 2006).

The Kanes' motion alleged three general instances of misconduct. First, their primary argument is that Stewart and the Bar were complicit in drafting a false affidavit for the Bar's expert witness, which the Bar submitted to the referee in response to the Kanes' motion for summary judgment. The Kanes contend the affidavit is false because it was actually prepared by Stewart and represented his opinions, not those of the expert witness, and because the expert witness did not have sufficient time to review all of the materials that he claimed to have reviewed in drafting the affidavit. They also alleged that Stewart attempted to conceal his involvement through a series of e-mails. Second, the motion to dismiss alleged that Stewart and the Bar's expert witness gave false testimony in depositions regarding how the expert witness's affidavit was prepared, and that the Bar did not

correct the record. And third, the Kanes argue that the Bar allowed Stewart to substantially direct and control the prosecution of the disciplinary cases against them.

The referee heard testimony on the motion to dismiss contemporaneously to the final hearing. At the conclusion of this hearing, the referee orally denied the motion, finding that while there was misconduct, it was not serious enough to warrant dismissing the Bar's case. We agree.

The Court has made clear that the Bar has an obligation to process disciplinary cases in a fair and just manner. See Fla. Bar v. Rubin, 362 So. 2d 12, 16 (Fla. 1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct."). It is also clear that "the purpose of an attorney disciplinary proceeding is the protection of the public, not the vindication of private rights." Tyson v. Fla. Bar, 826 So. 2d 265, 268 (Fla. 2002) ("Disciplinary proceedings against attorneys are instituted in the public interest and to preserve the purity of the courts. No private rights except those of the accused attorney are involved.") (citing Application of Harper, 84 So. 2d 700, 702 (Fla. 1956)). Here, the referee did find that there was some evidence of misconduct: it is apparent that Stewart played a role in drafting the expert witness's affidavit, and he regularly

communicated with the Bar throughout the investigation and the initial phases of the disciplinary case. Stewart had a personal and financial interest in the outcome of these cases, and he should not have been permitted to be actively involved.[2] Nonetheless, we conclude that the referee did not abuse his discretion in denying the Kanes' motion. There is ample evidence to support the referee's recommendations that Charles Kane and Harley Kane engaged in serious misconduct. Stewart's actions and those of Bar counsel do not diminish such evidence. Moreover, the Bar, in response to the motion, voluntarily excluded both Stewart and its expert witness from any further participation in the case. As a result, Stewart played no role in the referee's ultimate recommendations as to guilt and sanction.

## B. Referee's Findings of Fact and Recommendations as to Guilt

We next address the referee's findings of fact and recommendations as to guilt. We conclude that the referee's factual findings are fully supported by competent, substantial evidence in the record. See Fla. Bar v. Frederick, 756 So. 2d 79, 86 (Fla. 2000) (holding that the referee's findings were supported by

_____

2. While the Kanes presented a number of e-mails between Stewart and the Bar documenting his involvement in the direction of the Bar's disciplinary case, it should be noted that there is at least one e-mail in the record indicating that Bar counsel cautioned Stewart about his participation, advising that the Bar "must and should" submit its own work product to the referee.

- 16 -

competent, substantial evidence, and thus the Court was " 'precluded from reweighing the evidence and substituting [our] judgment for that of the referee,' " quoting Fla. Bar v. Lange, 711 So. 2d 518, 520 n.5 (Fla. 1998)).  We also conclude that the referee's findings are sufficient to support the recommendations as to guilt, and we approve those recommendations in full.

### 1.  Rules 4-1.7(b), 4-1.7(c), and 4-1.8(g)

The referee found, and we agree, that the PIP lawyers' secret settlement with Progressive, memorialized in the MOU and the AMOU, was a conflict of interest and an improper aggregate settlement, in violation of Bar Rules 4-1.7(b), 4-1.7(c), and 4-1.8(g).  Under the terms of the MOU and AMOU, Progressive paid a lump sum to each of the PIP law firms.  The settlement was an aggregate settlement, in that it encompassed both the PIP claims and the bad faith claims, as well as attorney fees and costs.  The clients, both those named as plaintiffs in the Goldcoast case and those not named in the case, were required to release their PIP benefit claims and their pending or potential bad faith claims.  Progressive offered the PIP law firms collectively $14.5 million.  Under the AMOU, $1.75 million of this amount was designated to settle the Goldcoast case, $5.25 million would be paid to Kane & Kane, $4.38 million went to Marks & Fleischer, and a little more than $3 million would be paid to Watson & Lentner.  Beyond these distributions, the MOU and AMOU offered no other guidance or restrictions as to how the

money would be allocated. Thus, it was left entirely to the PIP lawyers to determine how much each client would receive and how much would be taken as attorney fees. This arrangement created significant conflicts between the PIP lawyers' interests and those of their clients, and between the PIP lawyers and the bad faith attorneys. The PIP lawyers decided that their clients who were not named in the Goldcoast case, a majority of the clients against Progressive, would be reimbursed for their unpaid medical bills plus interest but would not receive any money for their bad faith claims, even though they were required to release those claims. As a result, the PIP law firms were able to take a substantial amount in attorney fees—Kane & Kane took $4,144,055 in fees and Watson & Lentner took $2,522,792. Only their greed—nothing in the MOU or AMOU—prevented the PIP lawyers from compensating clients for their bad faith claims. Indeed, the referee found: "Therein lies the ultimate conflict. The settlement pitted the lawyers' interests against the interests of their own clients. The less the clients received, the more the PIP attorneys received." We agree with the referee that the PIP lawyers' most egregious violation occurred when they abandoned their clients' bad faith claims in favor of a greater fee for themselves.

### i. Charles Kane

Charles Kane urges the Court to disapprove the referee's recommendations of guilt because he argues that he was only minimally involved in the bad faith

litigation (Kane & Kane had no clients named as plaintiffs in Goldcoast); his clients did not retain the firm to pursue their bad faith claims; and the firm's clients did not have viable, perfected bad faith claims for which they were entitled to compensation. He also contends that the settlement with Progressive was not an aggregate settlement because Kane & Kane properly distributed settlement funds to its clients, consistent with their fee agreements. The clients received 100 percent of their unpaid medical bills and interest, and the firm was entitled to receive the remaining settlement money as fees and costs. We do not find Kane's arguments persuasive.

The evidence demonstrates that Charles Kane and Harley Kane worked closely with the other PIP lawyers in the representation of their clients against Progressive. The PIP lawyers collectively decided to pursue bad faith claims against Progressive, and they each took steps to assist in that litigation. Although the Kanes maintain that they were not authorized to pursue bad faith claims on behalf of their clients, their conduct indicates otherwise. Kane & Kane, like the other PIP law firms, filed bad faith civil remedy notices with the Florida Department of Insurance on behalf of some clients, a necessary first step in filing bad faith claims. Although only thirty-seven plaintiffs were named in the Goldcoast case, it is clear that the PIP lawyers, including Charles Kane and Harley Kane, understood that more clients would be added to the suit when their bad faith

claims were perfected. The weight of the evidence supports the conclusion that the PIP lawyers and the bad faith attorneys hoped to use the threat of bad faith claims for all of their clients, not just the named plaintiffs in Goldcoast, to pressure Progressive to settle. Indeed, William Hearon, one of the bad faith attorneys, testified before the referee that Progressive likely would not have settled the Goldcoast case if it had known that other bad faith cases could be filed against the company; Progressive would have wanted to settle all of the bad faith cases as a group if it could be done. Progressive did eventually offer a settlement that encompassed all of the PIP claims and all of the bad faith claims for all of the PIP lawyers' clients. However, once the settlement was reached, the PIP lawyers abandoned the bad faith claims for the clients not named in the Goldcoast case, taking the position that those clients did not have viable or perfected bad faith claims. As a result, they were able to take a substantial amount in attorney fees.

We do recognize that Charles Kane was the least involved in the bad faith litigation among the PIP lawyers. He did not attend most of the meetings between the PIP lawyers and bad faith attorneys, and he was not copied on any of the e-mails discussing strategy in the bad faith litigation. Nonetheless, Harley Kane testified that he did share some of these e-mails with Charles Kane, and Charles Kane was aware of the progress in the bad faith litigation to some extent. Charles Kane met with Larry Stewart in preparation for the April 2004 mediation with

Progressive, he authorized the bad faith attorneys to negotiate for the universe of bad faith claims and the PIP claims, and he signed the revised attorney fee schedule. Perhaps most significantly, Charles Kane attended the secret settlement meeting with Progressive on May 16, 2004, and he was involved in negotiating and drafting the MOU.

Kane points to other evidence in the record that he contends does not support the referee's findings. However, the referee had the opportunity to consider and evaluate this evidence. In making his findings and recommendations, the referee weighed Kane's version of events against other evidence in the record. We have long held that "[t]o succeed in challenging a referee's findings of fact, the challenging party must establish there is a lack of evidence in the record to support such findings or that the record clearly contradicts the referee's conclusions." Fla. Bar v. Glueck, 985 So. 2d 1052, 1056 (Fla. 2008). "An attorney cannot meet his burden by simply pointing to contradictory evidence when there is also competent, substantial evidence in the record to support the referee's findings." Id.

### ii. Harley Kane

Harley Kane, like his father, Charles Kane, argues that Kane & Kane was only minimally involved in the bad faith litigation, that the firm's clients did not retain Kane & Kane to pursue bad faith claims, and that the clients did not have viable, perfected bad faith claims for which they were entitled to compensation.

As discussed above, we do not find these arguments persuasive. We conclude that Harley Kane both knew of and consented to the bad faith attorneys engaging in settlement negotiations with Progressive for the entire universe of bad faith claims (those clients named in the Goldcoast case and those not named in that case). He was included on nearly all of the e-mail correspondence between the PIP lawyers and the bad faith attorneys discussing this strategy, and he attended meetings either in person or by telephone. Harley Kane also provided the bad faith attorneys an extensive list identifying all of Kane & Kane's PIP clients. Larry Stewart used the list and similar lists from the other PIP law firms to compile a chart listing all of the clients and claims included in the Goldcoast case and all of the PIP law firms' other clients and claims that would be added to the case. This information and, in particular, the potential bad faith claims for all 441 of the PIP clients were used to pressure Progressive into settlement. The e-mails indicate that Harley Kane was aware of this approach, and at no point did he take the position that he presents here—that his clients did not have viable or perfected bad faith claims. Only after the settlement with Progressive was finalized did Harley Kane and the other PIP lawyers assert that their clients, who were not named as plaintiffs in the Goldcoast case, did not have bad faith claims.

### iii. Darin Lentner

Lentner, like Charles Kane and Harley Kane, argues that the majority of his PIP clients did not retain Watson & Lentner to pursue their bad faith claims, and those clients were only entitled to recover their unreimbursed medical bills and interest. However, we find ample evidence to support the referee's conclusion that Lentner pursued bad faith claims for all of his firm's clients against Progressive, not just those named as plaintiffs in the Goldcoast case. Watson & Lentner filed civil remedy notices with the Florida Department of Insurance on behalf of clients. Once the Goldcoast case was filed and in the following two years when the bad faith attorneys continued to prosecute the case, Lentner and Laura Watson took steps to preserve their clients' bad faith claims, presumably so that those clients could be added to the Goldcoast case, and they indicated to Progressive that they had no authority to settle the bad faith claims. Lentner agreed to modify Watson & Lentner's original fee schedule with Larry Stewart and the bad faith attorneys, authorizing the bad faith attorneys to negotiate with Progressive for the entire universe of bad faith claims and the clients' PIP claims. He attended the mediation with Progressive in April 2004, and was present for those negotiations. Following the mediation, he sent an e-mail to the bad faith attorneys, indicating that they had done an excellent job. At no point did Lentner express the position he argues here—that his clients who were not named in the Goldcoast case were not entitled to recover for their bad faith claims.

## 2.  Rules 4-1.4(b) and 4-8.4(c)

The referee next found that respondents, in communicating the proposed settlement with Progressive to their clients, did not adequately explain the settlement so that their clients could make informed decisions and, in some instances, misled clients in violation of Bar Rules 4-1.4(b) and 4-8.4(c).  We agree with the referee that Charles Kane, Harley Kane, and Darin Lentner withheld from clients nearly all material information about the settlement, entirely to further their own interests.  The clients were not told: the total amount of the settlement; the fact that some clients (those named in the Goldcoast case) would receive money for their bad faith claims while other clients did not; the value of the bad faith claims, which some clients were required to waive without compensation; and the amount each respective firm intended to take as attorney fees.  The referee found that by failing to disclose these important facts, the respondents effectively misled their clients so that the clients would sign off on the settlement and Progressive would release the settlement funds.  The clients were never given the opportunity to make informed decisions about their cases.

### i.  Charles Kane and Harley Kane

Charles Kane and Harley Kane directed associates in their firm in their communications with clients regarding the Progressive settlement.  They are both equally responsible for the decision to withhold material information about the

- 24 -

settlement. The Kanes argue that because their clients only retained the Kane & Kane firm to pursue their PIP benefit claims, they were only required to reimburse those clients for their unpaid medical bills and interest, and they had no obligation to inform clients about the speculative value of their potential bad faith claims or the status of the Goldcoast case. We find these arguments to be without merit. The Kanes acknowledged during their testimony before the referee that the vast majority of their clients were not told the total amount of Kane & Kane's settlement with Progressive, the amount the firm received in attorney fees, that there was pending litigation concerning bad faith claims against Progressive, and that Progressive had offered some money to settle those claims. Charles Kane and Harley Kane, like the other PIP lawyers, used the threat of the collective bad faith claims for all 441 clients as pressure on Progressive to settle, and they only abandoned those bad faith claims when allocating the settlement funds. The bad faith claims had value, as the evidence indicates that Progressive offered $3.5 million to settle those claims at the mediation in April 2004. At the very least, Charles Kane and Harley Kane had an obligation to inform the firm's clients about the Goldcoast case, the impact of that case on the PIP claims, and the potential value of the clients' bad faith claims so that the clients could make a more informed decision as to whether to accept the settlement.

Charles Kane further violated his ethical responsibilities by drafting the disagreement letter, which intentionally provided incomplete and misleading information. As one example, it stated that Progressive was under a court order to produce documents that the bad faith attorneys believed would be "embarrassing" for Progressive, when in fact Progressive was facing sanctions for its discovery violations, a major incentive to settle. Although Charles Kane did not sign the notice letter, nor was it sent to any of Kane & Kane's clients, he was primarily responsible for writing it. This letter serves as further evidence that the PIP lawyers not only failed to disclose information but effectively misled clients regarding the settlement in order to secure the required releases so that Progressive would disburse the settlement funds.

## ii. Darin Lentner

Lentner also directed communications between his firm and clients regarding the Progressive settlement. He signed letters sent to clients, and he testified that he spoke with every client himself. Lentner's clients, like those of the Kane & Kane firm, were not told the total amount of Watson & Lentner's settlement with Progressive, the amount the firm received in attorney fees, that there was pending litigation concerning bad faith claims against Progressive, and that Progressive had offered money to settle those claims. Lentner also signed the

disagreement letter that was sent to Watson & Lentner's clients who were named as plaintiffs in the Goldcoast case.

Lentner maintains on review that the Bar Rules regarding confidentiality precluded him from revealing to the PIP clients the status of the Goldcoast case. This argument is without merit. As we have discussed, Lentner and the other PIP lawyers used the threat of the collective bad faith claims for all of their clients as pressure on Progressive to settle, and they only abandoned those bad faith claims when allocating the settlement money. The rules requiring confidentiality do not protect Lentner in his failure to disclose important facts about the settlement offer.

### 3.  Rule 4-1.5(f)

The referee found that all three respondents failed to provide their clients with closing statements, in violation of Bar Rule 4-1.5(f). Clients of both the Kane & Kane and Watson & Lentner firms signed contingent fee contracts. There is no dispute that the firms did not provide closing statements to their clients. Although there was testimony presented to the referee that a closing statement is not typically provided in a PIP case because the attorney fee is not taken as a portion of the client's overall recovery, the referee found, and we agree, that there is no specific exception in the Bar Rules authorizing this practice.

### 4.  Rules 4-8.4(c) and 3-4.3

Finally, the referee found that respondents' conduct was dishonest, deceitful, and contrary to honesty and justice, in violation of Bar Rules 4-8.4(c) and 3-4.3. We agree. The PIP lawyers intentionally excluded the bad faith attorneys from their negotiations with Progressive, despite the bad faith attorneys' significant work in the Goldcoast case. The PIP lawyers later met with Larry Stewart after the MOU was executed and offered only $300,000 to compensate all three bad faith attorneys, and the PIP lawyers refused to disclose the terms of the settlement. The PIP lawyers vigorously fought having to pay to the bad faith attorneys any money from the settlement. Respondents' actions were solely to preserve the largest fee for themselves.

In addition to their conduct during the Progressive settlement, Charles Kane and Harley Kane continued to engage in further dishonest acts. During the course of the unjust enrichment litigation, both Charles Kane and Harley Kane threatened to withhold compensation from their associates in order to force them to fabricate time records for use in the case. There is also evidence that Harley Kane later altered and inflated these time records. The inflated time sheets were provided to the bad faith attorneys and their counsel during discovery. Harley Kane admitted that the time records produced in discovery were "excessive."

In November 2008, after the judgment was entered against them in the unjust enrichment case, Harley Kane and Charles Kane filed petitions for Chapter

11 bankruptcy. The bankruptcy court dismissed the petitions as filed in bad faith. When the petitions were dismissed, the court granted the Kanes a ten-day stay of the effective date of the dismissal to allow them to file Chapter 7 bankruptcy petitions. However, in an effort to preserve the money in Kane & Kane's operating account, the bankruptcy court ordered that no money be distributed from the account except for payment of goods and services delivered or rendered to the firm in the ordinary course of business. In violation of this order, Harley Kane caused the law firm to pay his personal property taxes. Kane later testified before the bankruptcy court that he did not understand the distinction between himself and the law firm. The bankruptcy court found this testimony was "plainly fabricated."

Harley Kane and Charles Kane did file Chapter 7 bankruptcy petitions, seeking in part to discharge the judgment owed to the bad faith attorneys. The bad faith attorneys filed a "Complaint to Determine Dischargeability of Debts and Objection to Discharge." On May 10, 2012, the bankruptcy court entered a memorandum opinion, finding in favor of the bad faith attorneys in part and against them in part. The bankruptcy court found that the Kanes' debt to the bad faith attorneys was not subject to discharge because, in participating in the secret settlement with Progressive, they acted willfully and maliciously to injure the bad faith attorneys and reduce their legal fees. Although the Kanes' bankruptcy filings are not inherently dishonest or deceitful, their conduct during the bankruptcy

proceedings was: the bankruptcy court specifically found that Charles Kane and Harley Kane were untruthful in their testimony.

## C.  The Referee's Recommended Sanctions

Finally, we address the referee's recommended sanctions: the referee recommends that Charles Kane be suspended from the practice of law for three years, that Harley Kane be disbarred, and that Darin Lentner be suspended for two years.  In reviewing a referee's recommended discipline, this Court's scope of review is broader than that afforded to the referee's findings of fact because, ultimately, it is the Court's responsibility to order the appropriate sanction.  See Fla. Bar v. Anderson, 538 So. 2d 852, 854 (Fla. 1989); see also art. V, § 15, Fla. Const.  However, generally speaking, this Court will not second-guess the referee's recommended discipline as long as it has a reasonable basis in existing case law and the Florida Standards for Imposing Lawyer Sanctions.  See Fla. Bar v. Temmer, 753 So. 2d 555, 558 (Fla. 1999).

The referee in this case found that Charles Kane, Harley Kane, and Darin Lentner engaged in egregious misconduct: they secretly negotiated an aggregate settlement that created conflicts of interest between lawyers and clients, and left the bad faith attorneys with no compensation for their significant work in the Goldcoast case; in allocating the settlement funds, they abandoned their PIP clients' bad faith claims in favor of a greater fee for themselves; and they withheld

- 30 -

from clients nearly all the material information about the settlement, entirely to further their own interests. Given their actions, we agree with the referee that Harley Kane should be disbarred. We cannot agree, however, with the referee's recommendation that Charles Kane and Darin Lentner receive a sanction any less severe. This considerable violation of respondents' ethical responsibilities to their clients and the legal system, entirely for their own financial interests and at the expense of their clients, warrants disbarment. See Fla. Bar v. St. Louis, 967 So. 2d 108 (Fla. 2007) (disbarring attorney who negotiated a settlement of his clients' civil lawsuits against the DuPont Corporation, including a secret engagement agreement pursuant to which DuPont paid the attorney's firm $6 million, preventing the firm from representing any other clients in cases against DuPont; respondent did not fully disclose the terms of the settlement to clients and lied about the existence of the engagement agreement to a judge in a subsequent case).

Respondents urge the Court to consider St. Louis, and the related cases Florida Bar v. Rodriguez, 959 So. 2d 150 (Fla. 2007), Florida Bar v. Friedman, 940 So. 2d 428 (Fla. 2006) (table), and Florida Bar v. Ferraro, 839 So. 2d 700 (Fla. 2003) (table), involving law partners representing clients in civil suits against the DuPont Corporation. Respondents contend these cases indicate that each attorney's actions should be considered separately and different sanctions imposed based on each attorney's level of involvement. However, respondents' argument

in this regard ignores the conduct that is the basis for these disciplinary cases—each of the PIP lawyers, whatever their role had been in litigating the PIP claims or the Goldcoast case, attended the secret settlement meeting with Progressive in May 2004, each negotiated for and agreed to the terms of the settlement memorialized in the MOU and the AMOU, and each made the decision to compensate their PIP clients only for unreimbursed medical bills and interest. Charles Kane, Harley Kane, and Darin Lentner abandoned their clients' bad faith claims in favor of larger fees for themselves, and they withheld important information about the settlement from their clients. It is this conduct that we find warrants disbarment.

Respondents also argue that the referee's recommended sanctions are unsupported because there is no evidence of client harm. They note that none of their former clients filed complaints with the Bar indicating they were unhappy with the terms of the settlement. However, the referee's findings clearly indicate that respondents knowingly and intentionally agreed to a settlement that created conflicts of interest, and they failed to inform clients of those conflicts. The clients signed releases waiving their bad faith claims without receiving any compensation for those claims—all so that respondents could collect greater fees for themselves. We conclude that there is sufficient evidence of harm to clients and harm to our legal system, even if no client filed a complaint.

We have also considered the referee's findings in aggravation and mitigation. The referee found the same seven aggravating factors in each case: (1) respondents acted with a dishonest or selfish motive; (2) they engaged in a pattern of misconduct over several years; (3) they committed multiple offenses; (4) they made false statements during these disciplinary proceedings; (5) they have refused to acknowledge the wrongful nature of their conduct; (6) they have substantial experience in the practice of law; and (7) the referee found that respondents have shown indifference to making restitution. The referee also found two mitigating factors: respondents have no prior disciplinary record, and they presented evidence of their good character and reputation. We approve the referee's findings in aggravation and mitigation with one exception. The referee's report does not cite any specific statements or acts by respondents during the disciplinary proceedings that were dishonest. Rather, this aggravating factor seems to stem from the referee's conclusion that respondents have repeatedly refused to admit or acknowledge their misconduct. Because the referee also found as an aggravating factor that respondents refused to acknowledge the wrongful nature of their actions, we disapprove the referee's finding that respondents were dishonest during the disciplinary case. In either event, we find that the aggravating factors outweigh the referee's findings in mitigation. Accordingly, we approve the referee's recommendation that Harley Kane be disbarred from the practice of law. We

disapprove the referee's recommended sanctions for Charles Kane and Darin Lentner and instead impose disbarment.

Finally, the referee recommended that respondents, as a condition of seeking readmission or reinstatement, make the following payments: Charles Kane and Harley Kane be required to satisfy the civil judgment against them in the unjust enrichment case, and Darin Lentner be required to pay $856,789 to the Clients' Security Fund. We have previously required as a condition of reinstatement or readmission to practice that a lawyer satisfy an outstanding civil judgment. See, e.g., Fla. Bar v. Bloom, 632 So. 2d 1016, 1017 (Fla. 1994) (ordering that respondent Bloom "not be reinstated to the practice of law until he demonstrates his fitness to practice law which would include proof of satisfaction of the judgment entered against him in the underlying civil action on which this cause is predicated"). Accordingly, we approve the referee's recommendation that the Kanes be ordered to satisfy the civil judgment in the unjust enrichment case.

We disapprove, however, the referee's recommendation that Lentner pay $856,789 to the Clients' Security Fund. The final judgment in the unjust enrichment case entered judgment against Kane & Kane, Charles Kane, and Harley Kane, jointly and severally, for $2 million. In contrast, Judge Crow entered a judgment against "Laura M. Watson, P.A., d/b/a Watson & Lentner," in the amount of $981,792, but did not enter judgment against Laura Watson or Darin

Lentner individually.  Judge Crow concluded that there was no evidence that either Watson or Lentner was an individual party to any agreement with the bad faith attorneys, and there was no evidence presented as to the value of fees individually conferred upon either.  The Bar suggests that Lentner is nonetheless liable for half of the judgment because he signed a letter agreement with Laura Watson, drafted in anticipation of their divorce, agreeing that he would be responsible for 50 percent of the remaining liabilities of the Watson & Lentner firm, including the unjust enrichment case.  However, the Court has made clear that "disciplinary proceedings against attorneys are instituted in the public interest and to preserve the purity of the courts.  No private rights except those of the accused attorney are involved."  Fla. Bar v. Della-Donna, 583 So. 2d 307, 311 (Fla. 1989) (citing Harper, 84 So. 2d at 702).  Moreover, "[d]isciplinary actions cannot be used as a substitute for what should be addressed in private civil actions against attorneys. They are not intended as forums for litigating claims between attorneys and third parties."  Id. at 312.  Lentner's position is distinguishable from that of Charles Kane or Harley Kane, in that Judge Crow in the unjust enrichment case did not enter judgment against him personally, only against his former law firm.  Lentner may be responsible to the bad faith attorneys for some portion of the judgment against Watson & Lentner; however, this is not the proper forum to adjudicate that

issue. Thus, we disapprove the referee's recommendation that Lentner be ordered to pay $856,789.00 to the Clients' Security Fund.

## III. CONCLUSION

Accordingly, respondents Charles Kane, Harley Kane, and Darin Lentner are hereby disbarred. Respondents were suspended by order dated June 14, 2016. Darin Lentner's disbarment shall be effective nunc pro tunc June 22, 2016, the date his suspension became effective. Charles Kane's and Harley Kane's disbarments shall be effective nunc pro tunc July 14, 2016, the date their suspensions became effective. Respondents shall fully comply with Rule Regulating the Florida Bar 3-5.1(h).

Additionally, respondent Charles Kane and respondent Harley Kane are ordered, as a condition of readmission, to satisfy the civil judgment entered against them, as directed in the report of referee.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Charles Jay Kane in the amount of $11,831.65, for which sum let execution issue.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Harley Nathan Kane in the amount of $11,831.65, for which sum let execution issue.

Judgment is entered for The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2300, for recovery of costs from Darin James Lentner in the amount of $13,737.48, for which sum let execution issue.

It is so ordered.

LABARGA, C.J., and PARIENTE, QUINCE, POLSTON, and PERRY, JJ., concur.
LEWIS and CANADY, JJ., concur in result.

THE FILING OF A MOTION FOR REHEARING SHALL NOT ALTER THE EFFECTIVE DATE OF THIS DISBARMENT.

Original Proceeding – The Florida Bar

John F. Harkness, Jr., Executive Director, The Florida Bar, Tallahassee, Florida; Adria E. Quintela, Staff Counsel, Alan Anthony Pascal, Chief Branch Discipline Counsel, and Ghenete Elaine Wright Muir, Bar Counsel, The Florida Bar, Sunrise, Florida; and David Bill Rothman and Jeanne T. Melendez of Rothman & Associates, P.A., Miami, Florida,

     for Complainant

Scott Kevork Tozian and Gwendolyn H. Daniel of Smith, Tozian, Daniel & Davis, P.A., Tampa, Florida,

     for Respondents Charles Jay Kane and Harley Nathan Kane

John Preston Seiler of the Law Offices of Seiler, Sautter, Zaden, Rimes & Wahlbrink, Fort Lauderdale, Florida,

     for Respondent Darin James Lentner